ROBERT HENRY STEIMAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

STANLEY I. LIEBERMAN AND HELEN S. LIEBERMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 3714–70, 3715–70.   Filed September 23, 1971.

*Byron H. Higgins*, for the petitioners.
*Patrick R. McKenzie*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for 1967 as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 3714–70 | Robert Henry Steiman | $54.00 |
| 3715–70 | Stanley I. Lieberman and Helen S. Lieberman | 728.88 |

The only issue is whether the amounts received by the petitioners Robert Henry Steiman and Helen S. Lieberman as graduate assistants at Wayne State University while studying for doctor of philosophy degrees are excludable from income as scholarships or fellowships within the meaning of section 117.[1]

### FINDINGS OF FACT

Petitioners Robert Henry Steiman (hereinafter referred to as Robert) and Stanley I. Lieberman and Helen S. Lieberman, husband and wife (hereinafter Helen S. Lieberman will be referred to as Helen), were legal residents of Detroit, Mich., at the time their petitions were filed. For 1967 the petitioners filed their respective Federal income tax returns with the Central Service Center, Cincinnati, Ohio.

Robert received a bachelor of science degree from North Dakota State University in 1964. After working for a year, he entered the graduate program at Wayne State University (hereinafter Wayne State or university) in September 1965 as a master's candidate in the Department of Physiology and Pharmacology (hereinafter DPP). In 1967 he received a master's degree from that department and thereafter continued working toward a doctor of philosophy degree from the same department.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

Helen received a bachelor of arts degree in sociology from Wayne State in January 1960. Thereafter she worked as a teacher and took night courses until September 1966, when she entered Wayne State's DPP as a candidate for a doctor of philosophy degree. During the year in issue Helen was a graduate student in that department.

To obtain the doctor of philosophy degree in the DPP, all candidates are required to complete successfully a prescribed number of credit hours over a 4-year period. They must also each prepare a dissertation based on original research, perform satisfactorily on five oral examinations, and prepare a final defense of the dissertation. Also, all degree candidates are required to perform teaching duties as part of their training. This additional teaching requirement was added in 1966; it is designed to train the students in the teaching profession and to permit the DPP to evaluate their abilities to teach. These evaluations provide source material which may be used by faculty members in responding to inquiries from potential employers.

The DPP teacher-training program has several categories of activities, including the paramedical, occupational therapy, physical therapy, and medical technology programs. Within any given quarter of the academic year, degree candidates are assigned to one or more of the categories, depending upon their levels of advancement in the degree program. The category assignments are planned so that at the end of the 4-year program each student will have participated in each category. Since not all candidates can serve in the teacher-training program in the same academic quarter, assignments are made as positions become available.

The students' teaching activities are supervised by the faculty member who teaches the particular course to which the student is assigned. Under this faculty member's supervision, the students generate the lecture and laboratory programs, prepare and present lectures and laboratory experiments, and assist in the instruction and supervision of the class. The faculty member reviews the candidates' prepared work and decides if further preparation is needed, or if the students' work should be supplemented with additional information. Grades for the students being taught, as well as grades for the teaching students, are awarded by the faculty member. Upon completion of the supervised teacher-training course, the faculty member prepares a report on each student assistant, analyzing his teaching ability and performance while under that member's supervision. The teacher-training activities carried on by the candidates are primarily a learning experience; and, without the training program, the faculty members who supervise the degree candidates would teach the courses, but they would not have the added burden of training the candidates.

Wayne State has various types of financial assistance available to its graduate students to enable them to pursue their education. All of these types of financial aid are potentially available to those candidates in the DPP who need financial assistance. In addition to National Science Foundation (hereinafter NSF) trainingships, NSF fellowships, National Defense Education Act (hereinafter NDEA) scholarships and a number of other scholarships, fellowships, and research grants, the university maintains a program of financial aid designated as the graduate assistantship program. Funds under this program are awarded for a combination of part-time work and advanced study, and awards are conditioned upon the student's making regular progress toward his graduate degree. These assistantships are granted for the period from September to June of an academic year, i.e., the fall, winter, and spring academic quarters. Payments of the stipend received under an assistantship are made monthly during the period. No assistantships are given for the summer quarter, comprised of the 3-month period from June to September.

Within the graduate assistant program are two classifications—Graduate Assistant I and Graduate Assistant II. A graduate student without a master's degree who receives aid under this program is classified under the former category, and it carries a stipend ranging from $2,500 to $3,200; a student with a master's degree who is working toward a doctoral degree falls under the latter classification, and it carries a stipend ranging from $2,700 to $3,800. The annual salaries paid part-time instructors are less than these stipends.

All forms of financial assistance available at Wayne State, including the graduate assistantships, are awarded to the graduate students by the department in which they are pursuing their degree, and are based upon a student's qualifications and financial need. Since the various forms of aid carry different stipends, the determination of whether a qualified student will receive a graduate assistantship rather than some other form of aid depends largely upon the extent of his financial need in relation to that of other candidates.

Wayne State's policy for the graduate assistantship stipends requires that students who receive financial aid under this program perform academically related services. Although the university has specified that services are required as a condition to the awarding of the assistantships, the nature and extent of the services are determined by the individual colleges and departments within the university. The DPP's teacher-training program satisfies the university's general requirement that students holding graduate assistantships perform academically related services as a condition to the award. No further services are required of those students.

Helen held a graduate assistantship awarded for the academic period from September 1966 to June 1967, and held another graduate assistantship for the period September 1967 to June 1968. Thereafter she held a NDEA scholarship for the remainder of her doctoral candidacy.

During the summer quarter of 1967, Helen participated in the teacher-training program. She was assigned to the laboratory section of an anatomy course taught by a member of the DPP faculty. Under the supervision of the faculty member, she helped to prepare the lectures and laboratory experiments, and assisted in preparing the laboratory examinations given to the students in the course. At the conclusion of this teacher-training course she was evaluated and rated on her ability by the faculty member under whose supervision she studied. Helen also participated in other teacher-training services during her study toward a doctoral degree; however, none of these other training services were performed during the year in issue. Helen's service activities under the teacher-training program were essentially the same in all years she was a doctoral candidate, that is, they did not vary when she changed from a graduate assistantship to a NDEA scholarship.

Robert was awarded a Graduate Assistant II for the academic period from September 1967 to June 1968; prior to that period he was a Graduate Assistant I for the academic period September 1966 to June 1967.

Robert also participated in the teacher-training program during the summer quarter of 1967. He assisted in the anatomy course in which Helen participated. Under the faculty member's supervision, he helped prepare and deliver laboratory lectures, and demonstrate and conduct laboratory experiments. He also received an evaluation of his teaching at the end of the course. Robert participated in other categories of the teaching program during his study for a doctoral degree, and his services in the other categories were similar to those in the anatomy course.

The only services rendered by both Robert and Helen pursuant to the requirements under the graduate assistantship financial aid program were those services required by the teacher-training program in the DPP—the same service training required of all candidates for the doctoral degree in the DPP.

The university maintained individual personnel files on all graduate assistants, paid their stipends through its payroll office, and withheld Federal income tax from the stipends. The university also permitted graduate assistants to join the major medical program maintained by the university for its employees; other students were not granted this privilege.

Respondent, in his notice of deficiency, disallowed the exclusions from income of the amounts received during 1967 by both Robert and

Helen as stipends from the graduate assistantships on the ground that such amounts were not excludable under section 117.

OPINION

Section 117(a)(1) excludes from an individual's gross income amounts received "as a scholarship at an educational institution" or "as a fellowship grant." This exclusion from income is subject to a limitation under section 117(b)(1) for any amount "received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant"; such an amount is taxable as compensation for services. However, as an exception to this limitation, the section provides that "If teaching, research, or other services are required of all candidates * * * for a particular degree as a condition to receiving such degree, such teaching * * * shall not be regarded as part-time employment within the meaning of this paragraph." For an extensive review of the legislative history of these provisions, see *Elmer L. Reese, Jr.*, 45 T.C. 407 (1966), affirmed per curiam 372 F. 2d 742 (C.A. 4, 1967).

In the instant case, we are presented with a situation where the students were required to perform academically related services as a condition to the receipt of their stipends, thus raising the possibility that such payments represented compensation for services within the limitation set forth in section 117(b)(1). At the same time, however, the services performed by these students were also required as a condition to the award of the doctor of philosophy degree in the DPP, and were required of all candidates for that degree regardless of whether they were graduate assistants. This latter circumstance requires consideration of the exception to the limitation, i.e., a decision as to whether or not the DPP graduate assistantships are to be "regarded as part-time employment" within section 117(b)(1).

The "dual condition" of these awards, that is, stipends requiring services which are also a prerequisite to obtaining a degree, has been the subject of several prior decisions of this Court. *Edward A. Jamieson*, 51 T.C. 635 (1969); *Stephen L. Zolnay*, 49 T.C. 389 (1968); *Elmer L. Reese, Jr., supra; Chander P. Bhalla*, 35 T.C. 13 (1960), acq. Rev. Rul. 63–250, 1963–2 C.B. 79. From these decisions has been distilled the rule that in order for such payments to be excluded from income under the exception to the limitation prescribed by section 117(b)(1), the payment must initially be found to have the characteristics of a scholarship; this means that "the primary purpose of the payment must be to further the education and training of the recipient rather than to compensate the recipient for services rendered or to be rendered which directly benefit the payor." *Elmer L. Reese, Jr.*,

*supra* at 411, and cases cited therein. Once it is determined that the primary purpose for the stipends was the furtherance of education rather than compensation for services, then the exception to the limitation under section 117(b)(1) for services required of all degree candidates will exclude the entire stipend from income in accordance with section 117(a). *Elmer L. Reese, Jr., supra at* 415. Determination of the primary purpose of such payments in each case must necessarily "turn upon its own particular facts and circumstances." *Stephen L. Zolnay, supra* at 395.

Respondent contends that the stipends received by the petitioners while serving as graduate assistants were payments for services rendered to the university; petitioners argue that their relationship to the university as graduate assistants was primarily that of student-teacher rather than employer-employee. On consideration of the entire record, we agree with petitioners.

The university's general policy toward graduate assistantships was summarized by the vice president for graduate studies and research when he testified that "the primary function of the graduate assistantship is to enable graduate students to pursue their graduate studies." Since administration of many of the university's policies at the graduate level were decentralized to the several departments, we express no opinion concerning graduate assistantships in the university's other departments of study. However, we think the summary statement of the vice president is amply supported by the evidence of record with respect to graduate assistantships granted to students in the DPP. In other words, both petitioners have shown that, during the year in issue, they were "paid to study" rather than "paid to work," *Stephen L. Zolnay, supra* at 396. We think this is demonstrated by the criteria for the selection of graduate assistants, the duties which they were assigned, and the training emphasis in the performance of those duties.

As noted in our Findings, the financial need of academically qualified students, rather than their teaching abilities or experience, was the primary consideration in deciding whether individual students would be awarded graduate assistantships, some other form of financial aid, or no financial assistance at all. A graduate officer of the DPP testified that an effort was made to provide each student receiving assistance "with the kind of a fellowship that would assist him most in his educational pursuit." Within the limitations of available funds, prior to the beginning of a school year the available resources and the list of student applicants were surveyed, and awards were made. In some cases students were shifted from one type of assistance to another carrying larger benefits when their financial needs justified it. Thus, the potential benefit of a student's services to the DPP was not the primary consideration in the selection of its graduate assistants.

Consistent with this selection procedure, the DPP prescribed no special tasks for graduate assistants not required of other graduate students. The services graduate assistants were required to perform in the teacher-training program were always in their area of interest, study, and expertise, and were similar to those performed by all other students in the department, whether or not they were receiving financial assistance. In fact, a professor without special knowledge of the financial aid arrangements could not tell, by observing a predoctoral candidate's performance, what kind of financial aid the student was receiving or, indeed, whether he was receiving assistance of any kind.

Furthermore, the teaching services which satisfied the university's service requirement for DPP graduate assistants were geared to providing the students with additional training rather than securing a direct benefit for the university. Their duties—consisting generally of laboratory instruction, handling seminars, research and medical laboratory demonstrations, examination proctoring, and other duties designed to train individuals for the teaching profession—were performed under the direct supervision of a professor, and all grades were assigned by the faculty member. In conformance with the instructional nature of the services, upon completion of a graduate student's work in a course an overall evaluation of his performance and abilities was made by his professor and included in his student file. This evaluation was available for use in answering inquiries from prospective employers on the potential teaching abilities of the student. The same procedure was followed for all graduate students in the DPP, whether or not they were graduate assistants.

Finally, the close supervision of the teaching services of the graduate assistants, as well as the other students, meant that their services did not materially aid the work of the DPP staff. The testimony is that the burden of this supervisory work more than offset the benefits realized by the professors. If the university's objective had been to relieve the DPP staff, it could have employed part-time instructors at salaries lower than the stipends paid the predoctoral graduate assistants.

Respondent stresses the university's administrative handling of graduate assistantships, including the medical benefits available to graduate assistants but not to other students, the withholding of income taxes with respect to the stipends, and the maintenance of individual employee folders. We think these factors merely reflect the university's decisions on how to handle the administration of the graduate assistantships. Their weight is largely offset by the fact that graduate assistants were denied the workmen's compensation and retirement coverage, vacation, sick and disability pay, and life insurance benefits provided for university employees. Furthermore, the

determination to withhold income taxes was evidently made by the university merely as a precautionary measure in order to safeguard itself against possible penalties for failure to perform its duties. See *Chander P. Bhalla, supra* at 17–18.

In summary, we conclude that the graduate assistantships held by petitioners during the year in controversy had the "normal characteristics associated with the term 'scholarship'" or fellowship, *Elmer L. Reese, Jr., supra* at 413; *Edward A. Jamieson, supra* at 639, rather than those associated with "compensation * * * given only as a '*quo*' in return for the *quid* of services rendered." *Bingler* v. *Johnson*, 394 U.S. 741, 757 (1969). Thus, in accordance with the exception under section 117(b)(1), the entire amount of the stipends received by petitioners during 1967 is excludable from their taxable income.

To reflect our findings,

*Decisions will be entered for the petitioners.*

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise noted.