DAVID M. BRUBAKKEN, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3790–75.  Filed November 18, 1976.

*Robert D. Heidel* and *Lorence D. Wheeler*, for the petitioner.
*Scott R. Cox*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioner's Federal income taxes in the amounts of $517 for 1971 and $1,941.68 for 1972. The sole issue for decision is whether payments received by the petitioner, a psychology intern, are excludable from gross income as a scholarship or fellowship grant under section 117(a) of the Internal Revenue Code of 1954.[1]

#### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

The petitioner, David M. Brubakken, resided in Madison, Wis., at the time of filing his petition herein. He filed timely Federal income tax returns for the taxable years 1971 and 1972 with the Internal Revenue Service Center, Kansas City, Mo.

The petitioner received his M.S. degree in clinical psychology from Washington State University (the university) in 1970. During the taxable years 1971 and 1972, he was a candidate for the Ph.D. degree in clinical psychology at the university. All candidates for the Ph.D. degree were required to serve a 1-year internship at an American Psychological Association (APA) approved institution as a condition to receiving such degree. In order to fulfill that requirement, from September 13, 1971, to September 13, 1972, the petitioner served as an intern in clinical psychology at Mendota State Hospital[2] (the hospital) in Madison, Wis. During that time, he also paid tuition to the university as an enrolled clinical psychology student.

The hospital was operated by the State of Wisconsin for the purpose of treating mental and emotional illnesses. Its 600 patients came from a geographic area consisting of approximately half of the State of Wisconsin. The hospital's services included a day hospital and outpatient services, a treatment and school program for children and adolescents, a special infirmary unit for geriatric patients, and an intensive treatment program for adults organized on the unit system. The professional clinical staff consisted of 11 Ph.D. psychologists, 31 physicians (22 of whom were psychiatrists), 28 psychiatric social workers, and 21 activity therapists. The hospital also served as a teaching resource for the University of Wisconsin Psychology Department, Medical School, Psychiatry Department, and Social Work and Nursing Training programs.

The hospital's internship program was administered by the Psychology Training Committee (the committee). Selection of the interns was based upon the academic credentials of the applicant and letters of recommendation from major profes-

---

[2] The parties have referred to this institution as Mendota Mental Health Institute. However, Mendota State Hospital did not become a mental health institute until Aug. 5, 1973, which is subsequent to the years at issue. See Wis. Stat. Ann. secs. 51.001, 51.15 (Supp. 1975).

sors describing the applicant's performance. Three years of academic training in clinical psychology was also a prerequisite for acceptance into the program. The committee chose the petitioner as 1 of 3 interns from over 100 applications for the positions.

During their training, psychology interns were rotated through various units. The decision as to the particular units to which interns were assigned was made by the committee and was based upon available patients, hospital programs, available supervision, and the abilities and needs of the intern. A description of the internship program for 1971–72, prepared by the committee and issued to prospective applicants, described these rotation assignments as follows:

Rotation Assignments * * *

During each of these rotation assignments the intern *will function as a member of a ward staff* under the supervision of a staff psychologist and the service chief. He is expected to learn what contributions are made to assessment, planning, management, and behavior modification by other members of the staff *and to coordinate his efforts with theirs.* * * *

For the last rotation assignment the intern may elect to work on any of the adult or child and adolescent services in the hospital or, * * * he may elect to work with the staffs of nearby institutions * * * or he may propose to the Psychology Department staff some other use of this time period. The general purpose of this optional period is to provide the intern with an opportunity to expand his skills in areas that are of special interest to him. * * *

[Emphasis supplied.]

The internship training program was established in 1967. The program initially received provisional accreditation from the APA; it became fully accredited on October 5, 1972. As part of the accreditation process, an APA committee visited the hospital early in 1971. In its report evaluating the internship training program, the APA committee described the program in part as follows:

In the training program itself, one of the goals is to help the student come to recognize his strengths and weaknesses *and by the end of the internship year, to be able to be considered a full-time staff member.* They feel the student should become competent in interviewing and psychological evaluation, in report writing as well as gaining some experience with psychotherapy for individuals, couples, and families. * * *

When a student is on one of the units, *he functions as a member of a treatment team.* * * * The interns assist in such things as formulating

treatment goals, establishing and maintaining liason [sic] with school officials and, on occasion, they may be involved in moving into the community to visit a patient's family after a patient has been admitted to a hospital.

[Emphasis supplied.]

During his internship, the petitioner was assigned first to the adolescent unit, then to the alcoholism treatment unit, and finally to the children's unit. On each of these units, he was not primarily responsible for the care of the patients but assisted in their care by administering and interpreting psychological tests, by interviewing patients and their families, by conducting individual and group therapy sessions, and by participating in professional staff meetings. During the last few months of his internship, he also taught various techniques in the treatment of disturbed children to the paraprofessional staff of the children's unit. At the beginning of his work, the petitioner's activities with the patients were subject to extensive supervision by a member of the psychology staff, but as the petitioner acquired more experience, he was given more independence and received less supervision.

The petitioner was expected to devote 40 hours per week to the internship program, but not all of this time was spent working on the unit to which he was assigned. In addition to his services on such unit, he also participated in various activities related to his personal development and training, including a professional growth group for interns. Some of these activities were conducted at the hospital, while others took place at other institutions in Madison. Regular staff psychologists did not participate in such activities.

At the start of his internship, the petitioner entered into a training and employment agreement with the hospital. Pursuant to the terms of this agreement, he was a classified employee of the Wisconsin Department of Health and Social Services (the department), subject to all civil service rules and regulations affecting persons in a trainee status. He agreed not to accept or retain other employment which might interfere with his training program. Additionally, he agreed to consider employment with the department upon receiving his doctoral degree although he was not required to accept such employment. The recruitment of qualified psychologists was not the primary purpose of the hospital administration or the psychology staff for the establishment of the internship

training program. Staff turnover at the hospital was relatively low, and very few interns were hired as regular staff members at the completion of their internship year.

Psychology interns were paid from general program revenue funds of the State of Wisconsin; no special funds were set aside to finance the internship program. The pay scale for interns was related to the number of graduate training semesters completed and was set by Wisconsin's civil service salary schedule. The petitioner, who had completed all requirements for the Ph.D. except his dissertation, was paid $1,021 per month. He received payments totaling $3,051.23 during the taxable year 1971 and $9,200.77 during the taxable year 1972 from the department with respect to his participation in the clinical psychology internship program. The State withheld Federal income taxes, State income taxes, and FICA taxes from his stipend and made payroll charges for a retirement plan and for life, health, and malpractice insurance. He also was entitled to 10 days' vacation leave, holidays, and sick leave, without any reduction in payments made to him.

During his internship, the petitioner finished his dissertation, and in 1972, he received his Ph.D. degree. Upon the completion of his internship, he was hired as a regular staff member by the hospital at an initial salary of $1,145 per month. Of this amount, $100 was an automatic increase due to his having received his Ph.D. degree.

In his Federal income tax returns for the taxable years 1971 and 1972, the petitioner claimed exclusions under section 117 in the amounts of $3,051 and $9,557, respectively. With respect to the taxable year 1972, he now concedes that if the Court determines that he is entitled to exclude the payments he received as an intern, he is entitled to an exclusion of no more than $9,200.77.

OPINION

Section 117(a) excludes from gross income amounts received as a scholarship or fellowship grant. In the case of degree candidates, section 117(b)(1) imposes a limitation upon this exclusion; the exclusion does not apply to "any amount received which represents payment for * * * services in the nature of part-time employment required as a condition to

receiving the scholarship or the fellowship grant." However, section 117(b)(1) also provides, as an exception to such limitation, that if similar services "are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such * * * services shall not be regarded as part-time employment."

During his internship, the petitioner performed services for which he received a stipend; but since similar services were required of all candidates for the Ph.D. degree in clinical psychology, he seeks to fit his case within the exception to the limitation provided by section 117(b)(1). Similar situations have previously been considered by this Court. *Robert Henry Steiman,* 56 T.C. 1350 (1971); *Stephen L. Zolnay,* 49 T.C. 389 (1968); *Elmer L. Reese, Jr.,* 45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). Those cases establish that the fact that services are required of all degree candidates is not, in and of itself, determinative; in order for payments to be excludable from income under the exception to the limitation prescribed by section 117(b)(1), such payments must initially be found to have the characteristics of a scholarship or fellowship grant.

The terms "scholarship" and "fellowship grant" are not defined in the statute. However, section 1.117–3(a) of the Income Tax Regulations provides that "A scholarship generally means an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies." A fellowship grant is similarly defined as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Sec. 1.117–3(c), Income Tax Regs. Additionally, section 1.117–4(c)(1) of such regulations states that if any "amount represents either compensation for past, present, or future employment services or represents payments for services which are subject to the direction or supervision of the grantor," such amount does not qualify for exclusion under section 117. The Supreme Court has upheld the validity of such regulations, stating that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial

*quid pro quo* from the recipients." *Bingler v. Johnson,* 394 U.S. 741, 751 (1969). Under the regulations, the distinction between a scholarship or a fellowship grant and compensation turns on whether the primary purpose for making the grant was to enable the recipient to further his education or training in his individual capacity or whether the primary purpose was to compensate him for past, present, or future services. *Steven Michael Weinberg,* 64 T.C. 771, 776 (1975); *George L. Bailey,* 60 T.C. 447, 451 (1973); *Louis C. Vaccaro,* 58 T.C. 721, 728 (1972); *Robert W. Willie,* 57 T.C. 383, 388 (1971); *Robert Henry Steiman,* 56 T.C. at 1354; *Elmer L. Reese, Jr.,* 45 T.C. at 411.

The petitioner bases his claim that the payments he received as a psychology intern are excludable under section 117 upon the degree of supervision and control over his activities, and upon his contention that his services were not "necessary" to the hospital's operation. The Commissioner contends that the primary purpose of the stipend was to compensate the petitioner for services he performed as an intern. Alternatively, the Commissioner argues that the stipend was intended to induce the performance of future services.

We will consider the Commissioner's alternative argument first. He correctly points out that a contractual undertaking by the grantee to accept future employment is not required; the grantor's clear expectation that the training program will lead to future employment may be sufficient to establish that the payments are compensatory. See *Michael A. Smith,* 60 T.C. 279, 286 (1973); *Lawrence A. Ehrhart,* 57 T.C. 872, 882–883 (1972), affd. 470 F.2d 940 (1st Cir. 1973); *Robert W. Willie,* 57 T.C. at 390–391; *John E. MacDonald, Jr.,* 52 T.C. 386, 393 (1969). The Commissioner, relying in part on the training agreement signed by the petitioner, contends that the primary purpose of the internship training program was to facilitate recruitment of qualified psychologists. However, the evidence does not support the Commissioner's position. We accept the testimony of the petitioner's witnesses that the hospital harbored no clear expectation that psychology interns would remain as regular staff members after the completion of the internship year. Staff turnover was relatively low, and the hospital generally did not have permanent

positions available for its interns. Very few interns were ever hired as regular staff members. Although the petitioner was hired as a permanent staff member, his case is an exception, not the rule. On this record, there was no need to establish the internship program to secure the limited number of new psychologists needed by the hospital.

The petitioner maintains that his services were not necessary to the hospital because such services could have been performed by the psychology staff, and the chief administrator of the hospital so testified. But, as we stated in *Frederick Fisher,* 56 T.C. 1201, 1215 (1971):

More fundamentally, even if the Center *could* do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory. [Emphasis in original.]

The petitioner and his witnesses have attempted to minimize the extent and importance of his activities. However, both the description of the internship program issued to prospective applicants by the hospital and the APA report—both of which were prepared for purposes other than the trial in this case— state that during the rotation assignments the interns functioned as members of the ward staff and assisted in the care and treatment of patients. In addition, a careful analysis of the testimony discloses that a substantial amount of the petitioner's time was devoted to working directly with patients in such activities as testing, client interviewing, and individual and group therapy. At the time he commenced his internship, the petitioner had already received his M.S. degree in clinical psychology and had completed all of the requirements for the Ph.D. degree except his dissertation. Many of the functions he performed were the same as those of regular staff psychologists. Having considered the petitioner's prior education and experience, and the nature and extent of the services he performed, we believe he was capable of making, and did make, a substantial contribution to the care and treatment of patients. Compare *William Wells,* 40 T.C. 40 (1963). Although the services of psychology interns may not have been necessary in the sense that the hospital could have functioned without them, we are not convinced that it could have functioned as effectively, or that such services lacked

value to the hospital. Compare *Steven Michael Weinberg*, 64 T.C. at 778–779; *Frederick Fisher*, 56 T.C. at 1215; and *Aloysius J. Proskey*, 51 T.C. 918, 923 (1969), with *George L. Bailey*, 60 T.C. at 452–453, and *Frederick A. Bieberdorf*, 60 T.C. 114, 117 (1973).

The petitioner emphasizes the fact that he had no primary responsibility for the care of patients, and that his activities were at all times subject to the supervision and control of the psychology staff. These circumstances are not necessarily inconsistent with the presence of compensation. See *Steven Michael Weinberg*, 64 T.C. at 779. Most employees initially go through some training period[3] and are subject to some degree of supervision and control. Close supervision of the petitioner's work does not establish that his services were of no value to the hospital and may actually have increased their value. See *Frederick Fisher*, 56 T.C. at 1212; *Stephen L. Zolnay*, 49 T.C. at 397; *Ethel M. Bonn*, 34 T.C. 64, 72 (1960). The petitioner argues that he required such constant and careful supervision that his presence was a burden to the staff. See *Robert Henry Steiman*, 56 T.C. at 1356. However, one of the petitioner's witnesses, a member of the psychology staff, testified that as the staff developed confidence in his abilities, he was given more free rein and received less supervision. A certain degree of independence would appear to have been necessary if the internship program was to prepare him to function autonomously as a clinical psychologist.

The petitioner emphasizes that he participated in various activities, both within and without the hospital, which were related to his personal development and training and which were not available to regular staff psychologists. We do not doubt that he received valuable training during his internship; however, this factor is not determinative, for as we stated in *Aloysius J. Proskey*, 51 T.C. at 925:

Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117

---

[3] We note in this regard that all Wisconsin civil service employees served a 6-month probationary period at the beginning of their employment. Moreover, the State of Wisconsin had established a statewide employee training program. Wis. Stat. Ann. sec. 16.33. The petitioner's status, therefore, was no different from that of many other civil service employees.

requires that an amount paid as compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business, or profession. Whatever training petitioner received during the years of his residency—and we do not deny that it was substantial—was merely "incidental to and for the purpose of facilitating the *raison d'etre* of the Hospital, namely, the care of its patients." * * *

The petitioner also points out that the last rotation was a free period, which could be spent at another institution or in doing research. However, he was not engaged in research or in work at another institution, but spent his entire internship at the hospital. In determining whether the primary purpose for the payments to the petitioner was to further his individual training or to compensate him for services, we must consider all of the facts and circumstances of his case. See *Robert W. Willie,* 57 T.C. at 387; *Robert Henry Steiman,* 56 T.C. at 1355; *Stephen L. Zolnay,* 49 T.C. at 395; *William Wells,* 40 T.C. at 47. While there is evidence that the internship program provided valuable teaching and training to the petitioner, there is also evidence that he rendered substantial services for the benefit of the hospital, and we conclude that the primary purpose of the stipend he received was to compensate him for such services.

In this case, the amount of the stipend received by the petitioner is especially significant. Congress placed a dollar limitation on scholarship exclusions by nondegree candidates (sec. 117(b)(2)), but placed no such limitation upon degree candidates. Nevertheless, the lack of a statutory limitation does not preclude us from considering the very high rate of payment to the petitioner. *Stephen L. Zolnay,* 49 T.C. at 398 n. 7. Psychology interns were paid at levels established by the State for sub-Ph.D. psychologists; the level of stipend was set to be competitive with that offered by other programs. When the petitioner was hired as a permanent staff member at the end of his internship year, the payments to him increased by only $124 per month; $100 of this increase was attributable to his having received his Ph.D. degree. Such a modest increment in salary is further evidence that the services of the psychology interns were comparable to those of regular staff psychologists. We do not believe that the hospital would have paid its psychology interns such a high level of compensation if their services were of little or no value.

Moreover, the payments to the petitioner had none of the characteristics usually associated with a scholarship or fellowship grant, but had many of the characteristics of compensation. The petitioner was expected to work a 40-hour week. *Stephen L. Zolnay,* 49 T.C. at 397. The payments were not based upon financial need; rather, interns were paid a uniform amount based upon the number of graduate semesters completed. See *Steven Michael Weinberg,* 64 T.C. at 777; *Aloysius J. Proskey,* 51 T.C. at 924. Income taxes and FICA taxes were withheld from his stipend. See *Steven Michael Weinberg, supra; Aloysius J. Proskey, supra; Stephen L. Zolnay, supra* at 398. But see *Louis C. Vaccaro,* 58 T.C. at 730; *Robert Henry Steiman,* 56 T.C. at 1356. Additionally, the petitioner received paid vacation leave, holidays, and sick leave and was eligible to participate in a retirement plan and in group life, health, and malpractice insurance. These fringe benefits are usually characteristic of an employment relationship. *Steven Michael Weinberg,* 64 T.C. at 778; *Lawrence A. Ehrhart,* 57 T.C. at 881–882; *Irwin S. Anderson,* 54 T.C. 1547, 1552 (1970).

The petitioner relies upon the case of *Paul H. Chesmore,* T. C. Memo. 1974–271, in support of his position. However, the *Chesmore* case is distinguishable on its facts. The taxpayer in *Chesmore* was a student in clinical psychology at the Catholic University of America in Washington, D.C. He obtained his clinical training at a Veteran's Administration hospital and received a VA stipend. He treated only two or three patients per week and did some clinical testing about once every 2 weeks, and these activities were conducted under the strictest form of supervision. During a portion of one of the years at issue, he devoted almost his entire time to working on his dissertation. He was paid from funds specifically designated in the VA budget for the student training program. The VA did not withhold tax of any kind from his stipend, nor was he entitled to any fringe benefits. On that record, the Court found that his work was of little value to the hospital. On the contrary, the petitioner in the case before us spent a substantial portion of his time working directly with patients. The payments to him had none of the usual characteristics of a scholarship or fellowship grant, but had many indicia of compensation. We cannot find on the record before us that his

services were of such little value as to render the payments to him noncompensatory.

The petitioner also relies upon Rev. Rul. 75–280, 1975–2 C.B. 47, in which the Internal Revenue Service announced that if (1) the taxpayer is a candidate for a degree at an educational institution, (2) the taxpayer performs research, teaching, or other services for the institution that satisfy specifically stated requirements for the degree, and (3) equivalent services are required of all degree candidates, the IRS will assume that the amounts paid were for the primary purpose of furthering the education and training of the recipients in their individual capacities. Yet, it is clear that the petitioner's case does not come within the situation contemplated by the ruling, since the services were not performed for the institution that conferred the degree, and the ruling specifically excludes from its effect a taxpayer who "performs research, teaching or other services for a party other than the educational institution." Rev. Rul. 75–280, 1975–2 C.B. at 48. Accordingly, it is unnecessary for us to express any views as to whether the ruling represents a proper interpretation of the statute.

*Decision will be entered under Rule 155.*