MARK J. HOMER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Homer v. Commissioner
Docket No. 5718-75.
United States Tax Court
T.C. Memo 1977-66; 1977 Tax Ct. Memo LEXIS 378; 36 T.C.M. (CCH) 283; T.C.M. (RIA) 770066; March 14, 1977, Filed Richard S. Moskow, for the petitioner. John O. Tannenbaum, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency in petitioner's Federal income tax for the calendar year 1973 in the amount of $817.14. The sole issue is whether petitioner is entitled to exclude from gross income as a fellowship, under section 117(a)(1)(B), I.R.C. 1954, $3,600 received from the Beth Israel Hospital. FINDINGS OF FACT The parties have stipulated certain facts which, together with the attached exhibits, are incorporated herein by this reference. Petitioner Mark J. Homer resided in Brighton, Massachusetts, at the time the petition herein was filed. He filed his 1973 Federal income tax return with the Director, Internal Revenue Service Center, Andover, *379 Massachusetts. Petitioner graduated from the New York University School of Medicine in June of 1971, and completed a one-year internship program at Bellevue Hospital in New York City in June 1972. Thereupon he applied for and was accepted into a three-year Residency Training Program in Diagnostic Radiology at Beth Israel Hospital, Boston, Massachusetts, and was appointed, jointly, a Resident at Beth Israel Hospital and a Clinical Fellow at Harvard Medical School. These appointments became effective on July 1, 1972 and, with annual renewals, continued until June 30, 1975. During the year in issue here, petitioner completed the first year and began the second year of his residency. Beth Israel Hospital (the hospital) was established for the primary purpose of providing medical care to patients. The Radiology Department plays a central role in the hospital's clinical services, performing some 50,000 examinations of all types each year. Twelve board-certified radiologists (staff radiologists) serve in the department; in addition to providing patient services and supervising residents and other department personnel, staff radiologists devote substantial time to research. The *380 primary purpose of the Residency Training Program in Diagnostic Radiology (the residency program) is to provide three years of intensive instruction in diagnostic radiology. Applicants for the residency program are normally expected to have successfully completed an internship as well as having obtained their M.D. degrees; upon completion of the residency program, residents become entitled to take examinations leading to their certification as radiology specialists. During the year in issue, residents in the radiology department were required to be at the hospital, in general, each weekday from 8:00 a.m. to 5:00 p.m. In addition to staff meetings and residents' seminars, approximately four hours per day were devoted to working sessions. Most commonly, petitioner spent this time preparing preliminary diagnoses of X-ray films of current hospital patients, discussing each diagnosis with a staff radiologist, and then preparing a final report for transmission to the clinical personnel responsible for administering treatment to the patient. Petitioner was at all times closely supervised by a staff radiologist, and the staff radiologist was required to sign, and bore the legal responsibility *381 for, each report. Petitioner also, in the later periods of his residency, participated with a staff radiologist in performing certain angiographic procedures on patients. In the course of his normal daily activities, petitioner was expected to provide instruction for medical students, technicians and less-advanced residents at the hospital and also for students at the Harvard Medical School. He was occasionally required to prepare presentations for delivery at hospital staff meetings. Finally, petitioner was required to be on duty at the hospital approximately one weekday night in six, and also one or two weekend days per month. When on night or weekend duty, petitioner was expected to prepare a diagnosis whenever a patient required radiological examination, and to transmit such diagnosis to the clinical physician (either a resident or a staff physician) responsible for treating the patient. Normally, petitioner's diagnosis was acted upon; however, if a question arose, a staff radiologist was always on call and could be summoned to the hospital. Petitioner's diagnoses were always reviewed the next morning by a staff radiologist, and a final report signed by such staff radiologist.
*382 Each resident in the residency program received a stipend which the hospital characterized as "pay" in its own records. The amount of the stipend depended on level of training, not on financial need. In 1972-73, when petitioner was a firat-year resident, all first-year residents in all residency programs at the hospital received a stipend of $10,700. In 1973-74, when petitioner was a second-year resident, all second-year residents at the hospital received a stipend of $11,900. Petitioner received $10,700 during his first year of residency and $11,900 during his second year. The hospital withheld Federal income and FICA taxes from residents' stipends. In addition, residents also received, at no charge, laundry service, meals when on night duty, parking, malpractice insurance, life insurance, and paid vacation. Residents could enroll in a health plan wherein one-half of the premiums were paid by the hospital. Petitioner received $10,708 from the hospital during 1973, from which the hospital withheld $1,829.20 for Federal income taxes. On his 1973 return, petitioner excluded $3,600 from his gross income as a fellowship grant excludable under section 117 at the rate of $300 *383 per month. [1] The Commissioner disallowed the exclusion and increased petitioner's gross income by $3,600. OPINION Section 117(a)(1)[2] permits a taxpayer to exclude from gross income amounts received "as a scholarship at an educational institution" or "as a fellowship grant". In the case of a fellowship recipient who is not a candidate for a degree, the exclusion is limited to $300 per month. Petitioner is another in a long line of medical residents who have sought, almost always unsuccessfully, to exclude their residency stipends as fellowships under section 117. See Parr v. United States,469 F. 2d 1156, 1157 (C.A. 5). Although section 117 does not *384 define the term "fellowship", the regulations and the numerous cases have made clear the basic characteristics of an excludable fellowship. Section 1.117-4(c), Income Tax Regs.; see, e.g., David M. Brubakken,67 T.C. 249; Steven Michael Weinberg,64 T.C. 771; Frederick Fisher,56 T.C. 1202; Aloysius J. Proskey,51 T.C. 918; Elmer L. Reese, Jr.,45 T.C. 407, affirmed per curiam 373 F. 2d 742 (C.A. 4). Section 1.117-4(c)(1) of the Income Tax Regulations clearly excludes from the definition of a fellowship "any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor". In upholding the validity of this regulation, the Supreme Court characterized fellowships as "relatively distinterested, 'no-strings' educational grants, with no requirement of any substantial quidproquo from the recipients". Bingler v. Johnson,394 U.S. 741, 751. *385 See also Hembree v. United States,464 F. 2d 1262 (C.A. 4). The payments which petitioner received from the hospital are no different from payments which have been found by this Court in many other cases to be compensatory in nature. Petitioner performed numerous services which were of value to the hospital. He prepared preliminary diagnoses of x-ray films and, under the supervision of a staff radiologist, reached a final diagnosis and prepared a final report. He was expected to provide instruction to technologists and other personnel of the radiology department, and to make presentations at hospital staff meetings regarding activites in the radiology department. He was required to be at the hospital at specified duty hours; most particularly, he was required to be on duty at night and on weekends, times at which a staff radiologist would otherwise have to have been present at the hospital rather than merely "on call". Specified duty hours and the performance of valuable functions are well-recognized hallmarks of an employee. Steven Michael Weinberg, supra,64 T.C. at 778; Frederick Fisher,supra,56 T.C. at 1213; Sheldon A. E. Rosenthal,63 T.C. 454, 457. *386 Compare George L. Bailey,60 T.C. 447. Moreover, petitioner's relationship with the hospital had all the indicia of employment, rather then fellowship, status. The hospital termed his stipend "pay" and deducted Federal income and FICA taxes therefrom. Petitioner received numerous frings benefits, such as paid vacation, life and health insurance, which are normally associated with employee status. Steven Michael Weinberg, supra,64 T.C. at 777; Aloysius J. Proskey,supra,51 T.C. at 924; Stephen L. Zolnay,49 T.C. 389, 398; but see Louis C. Vaccaro,58 T.C. 721, 730. Petitioner's stipend was substantial in amount, and depended not on financial need but on level of training. Sheldon A. E. Rosenthal, supra,63 T.C. at 460; Stephen L. Zolnay,supra,49 T.C. at 398; cf. Robert Henry Steiman,56 T.C. 1350, 1355. Petitioner stresses three points in trying to distinguish his stipend from other payments to residents. First, he points out that he had little direct contact with patients. This fact is irrelevant, however, since a diagnostic radiologist's *387 work does not normally involve direct patient contact. Cf. Morgan M. McCoy, II,34 T.C.M. 1435, 1437. Second, he asserts that the hospital had to hire additional staff radiologists in order to support the resident training program, and that it could have performed all required patient services with fewer staff radiologists if it had not been for the time spent with residents. Even if this assertion is accurate, we doubt that the staff radiologists could have performed desired research and support services, as well as patient services, without the aid of residents and without night or weekend duty at the hospital. In any event, that a hospital could do without the services of its residents is irrelevant when the hospital has not, in fact, done so. Frederick Fisher,supra,56 T.C. at 1215. Finally, petitioner argues that the supervision performed by staff radiologists was so close as to deprive the residents' services of any independent value at all. The description of the residency program provided by the hospital, however, suggests that residents were given increasing responsibility as their expertise increased. See David M. Brubakken,supra. *388 And in any event, we have previously noted that close supervision is frequently characteristic of employment relationships and may, indeed, increase the value of the employee's services to his employer. David M. Brubakken,supra.
Since we find no substantial differences between the payments received by petitioner and those which have heretofore been characterized as compensation to residents at other hospitals, Decision will be entered for the respondent. Footnotes
1. In fact, petitioner claimed the exclusion as an adjustment to income in calculating adjusted gross income, but the effect appears to be the same.↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, including the value of contributed services and accommodations * * *↩