ROBERT P. and OLIVIA W. RUSSELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Russell v. Commissioner
Docket Nos. 10287-77, 4212-78.
United States Tax Court
T.C. Memo 1980-231; 1980 Tax Ct. Memo LEXIS 351; 40 T.C.M. (CCH) 564; T.C.M. (RIA) 80231; July 3, 1980, Filed D. Shackelford Shipp, for the petitioners. Robert W. West and Linda J. Wise, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1975 and 1976 in *352 the amounts of $621.39 and $800, respectively. The only issue for decision is whether a portion of the amounts received by petitioner-husband from the University of Mississippi Medical Center and the Veterans Administration Hospital in 1975 and 1976 are excludable from income as a scholarship or a fellowship grant. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Robert P. and Olivia W. Russell, husband and wife, who resided in Jackson, Mississippi, at the time of filing their petition in this case, filed joint Federal income tax returns for the calendar years 1975 and 1976 with the Internal Revenue Service Center in Chamblee, Georgia. Dr. Robert P. Russell (petitioner) completed medical school in June of 1971. Upon completion he served a year internship at Baptist Medical Center in Jackson, Mississippi. He then served as a general medical officer in the Navy stationed in Pensacola, Florida, from July 1, 1972, until June 30, 1974. On July 1, 1974, petitioner entered a three-year residency program in ophthalmology at the University of Mississippi Medical Center (UMC) in Jackson, Mississippi. To practice as an ophthalmologist *353 in Mississippi, a doctor must be certified by the American Board of Ophthalmology. Certification requires completion of 36 months of formal residency in an approved program. The UMC program has been approved by the American Board of Ophthalmology. For the period beginning July 1, 1975, [1] and ending June 30, 1976, petitioner entered into the following contract with UMC: This contract made and entered into by and between the UNIVERSITY MEDICAL CENTER hereinafter called the party of the first part, and Robert P. Russell, M.D., (Mississippi License No. 6239) hereinafter called the party of the second part, witnesseth: I. That the party of the first part does hereby contract with, accept, and employ the party of the second part as a postgraduate house staff officer at University Medical Center, Jackson, Mississippi (and/or at departmental facjlities, Clinics, or hospitals, thereunder) for the period beginning July 1,1975 and ending June 30,1976, at and for the sum of $10,500.00 payable in 12 monthly installments at the close of the months *354 of July through June, inclusive (provided, however, if and when during the period specified above, the party of the second part serves at the Veterans' Administration Hospital at Jackson, Mississippi, or at another hospital or institution with the specified concurrence and approval of the University Medical Center then said Veterans' Administration Hospital or other hospital or institution may be responsible for the direct payment to the party of the second part for the services rendered and the time served and a pro rata deduction may be made by University Medical Center from the amount to be paid as specified above; provided also that if and when the party of the second part is appointed and serves as chief administrative resident by the University Medical Center then his pay shall be increased for the period so served in accordance with rates established for such service). II. University Medical Center agrees further that: 1. It will provide an educational program for postgraduate house officer training in keeping with standards established by the Council on Medical Education of the American Medical Association (and/or the standards of the American Medical Association's *355 current "essentials of Approved Residences"); 2. It will administer the house staff officers program in accordance with the policies, rules and regulations of the Board of Trustees of Institutions of Higher Learning and the University of Mississippi; 3. It will issue an appropriate Certificate upon satisfactory completion of the postgraduate training program; 4. House staff officers will be represented on standing committees of the medical staff of University Hospital as provided by the Medical Staff Bylaws; 5. House staff officers shall not be required to perform duties other than those related to the residency training programs; 6. House staff officers shall have all the rights, benefits, and privileges of employees as detailed in the Handbook for Employees of the University of Mississippi Medical Center, with the exception that house staff officers beyond the first post-graduate year accumulate vacation at the rate of 1-1/4 days each month so that they are entitled to 15 full working days of vacation per year. However, house staff officers shall not be entitled to take 15 days vacation per year if such is not permitted by the medical specialty board of the training *356 program in which they are enrolled; 7. House staff officers shall have the rights of grievance procedures as detailed in the Handbook for Employees of the University Medical Center and in the Medical Staff Bylaws, Rules and Regulations of the University Hospital. III. The party of the second part agrees further that: 1. He will serve during the entire period agreed upon as specified above, will fulfill the educational requirements for the program, and accept the obligation to use his best efforts to provide safe and effective patient care as assigned or required under the circumstances as delineated in the "Essentials of Approved Residences" and standards of the American Medical Association Council on Medical Education; 2. He will comply with all laws, regulations and requirements of the State of Mississippi, as to the practice of medicine and all laws, regulations, and policies governing said University Medical Center, including University Hospital Medical Staff Bylaws; 3.He will consider the stated stipend and the experience and instruction received as sole compensation from University Hospital or affiliated institutions for training program related activities and *357 will not accept fees in any form from patients treated or seen by him as part of his prescribed training program; 4. He will secure and maintain personal professional liability insurance in the amount of 100,000/300,000 and keep same in force during the period specified above. IV. Both parties further agree that: 1. Any grievances of the party of the second part shall be submitted in accordance with procedure as prescribed in the Handbook for Employees or the University Hospital Medical Staff Bylaws; 2. In accordance with the Constitution of the State of Mississippi (Article 8, Section 213-A), the party of the first part shall have the power and authority to terminate this contract at any time for malfeasance, inefficiency or contumacious conduct by the party of the second part; 3. The party of the second part does hereby accept the employment herein above specified upon the terms and conditions herein stated.
For the period beginning July 1, 1976, and ending June 30, 1977, petitioner entered into a contract with UMC substantially the same as the contract between petitioner and UMC for the year July 1, 1975 to June 30, 1976, except that the annual rate of compensation *358 was $11,000. Petitioner accepted the residency to further his education so that he could obtain the certificate required to practice ophthalmology. He was not, however, a candidate for a degree. Petitioner's residency work was not confined to UMC. He spent two months studying a basic science course in Houston, Texas, in 1975.He had two three-month rotations during 1975 and 1977 in the private offices of Drs. Suares and Gamble in Greenville, Mississippi, and one three-month rotation during 1976 in Dr. Williams' private office in Pascagoula, Mississippi. Additionally, he spent several months each year at the Veterans' Administration Hospital (VAH). Also petitioner as chief resident spent three months during 1977 heading the UMC Addie McBryde Outpatient Clinic which was mainly serviced by the residents of the UMC ophthalmology program. Petitioner spent the remainder of his time in residency at UMC in the private clinic assisting private opthalmologists with their patients. The residency program was under the guidance of Drs. Samuel Johnson (the director of the program), Raoul Valenzuela, and Delmar Caldwell. Petitioner as a resident at UMC completed case histories of patients, *359 completed medical examinations of patients, made tentative diagnoses of patients, suggested medication for patients, provided pre-operative and post-operative patient care for patients, performed surgery on patients under supervision and was frequently on call for duty at UMC. He also made rounds with the staff opthalmologists. The opthalmology department at UMC, both the Addie McBryde Clinic and the private clinic, was basically a private practice as opposed to a charity practice. The Addie McBryde Clinic was in a separate building from the regular UMC facilities. Its patients were referrals from opthalmologists outside UMC, doctors other than ophthalmologists at UMC, and optometrists. The patients at the Addie McBryde Clinic many times paid less than full price for their treatment, but few received their treatment free of charge as in a charity hospital. The private clinic served the patients of the UMC opthalmologists. Petitioner's duties as a resident at UMC, both during regular hours and while on call for emergency duty, were always as the agent of a staff ophthalmologist who was ultimately responsible for the patient. As he became more proficient, petitioner was given *360 more responsibility and did treat patients without direct supervision when the ophthalmologist for whom he was acting considered him capable to do so. As other doctors, the residents at UMC did not have set hours; rather, they worked until the workload was completed and were then free to leave. None of the residents were listed as the doctor responsible for a patient and their name never appeared on a patient's record without the name of the staff doctor under whose supervision they were working. The residents did not bill patients directly. The patients at both the private clinic and the Addie McBryde Clinic were screened to afford the UMC opthalmology residents a varied training background. While the purpose of the medical school was to teach the residents, once a patient was admitted to the hospital the first priority of the UMC staff was the care of the patient. Around 25 percent of the UMC ophthalmology surgery is performed by the residents. Most of this surgery is done during a resident's third year and is generally on the Addie McBryde Clinic patients. The other 75 percent of the surgery is performed by the UMC ophthalmologists with residents acting as first assistants. *361 Residents are always a part of the surgical team in the ophthalmology department at UMC. During the years in question, there were between 15 and 18 patients at UMC in the care of the ophthalmology department at any one time and 2 to 3 residents a year in the ophthalmology department. If the residents were not available to act as first assistants in surgery, someone else would have to act as the first assistant. The residents in the ophthalmology department each received the same yearly amounts with a $500 increase in the second and again in the third year of residency. Meals were not provided to the residents by UMC. Residents were allowed vacation time under their contract with UMC, but it depended upon the need for their services whether it could be granted when requested. Residents were allowed sick leave under their contracts, but petitioner only once used any of his sick leave. Petitioner's malpractice insurance was paid by UMC. Group hospitalization insurance rates were available to petitioner as a member of the UMC house staff. The ophthalmology department staff physicians charged their patients for the work of the residents and Medicare also provided for payments *362 to UMC for the work of residents. The residents were paid out of the ophthalmology department funds from the State of Mississippi. Ophthalmology residents were not required to stay at UMC upon completing their residency; it was hoped, however, that they would stay and practice in the State of Mississippi.
During the time petitioner spent at VAH, he was paid by VAH.UMC deducted those amounts paid by VAH from the amounts to be paid petitioner under his contract so that he received only the yearly amount stated in the contract. Both VAH and UMC withheld social security taxes and Federal and state income taxes from the amounts paid petitioner. When working under the private ophthalmologists in Greenville and Pascagoula, petitioner was given an additional allowance for an apartment and was paid by the State of Mississippi through the UMC ophthalmology department. In 1975 and 1976, respectively, petitioner received $4,999.98 and $7,031.20 from UMC and $5,010.76 and $4,064.20 from VAH for his residency. He also received $12,060 and $13,680 for weekend work in an ancillary emergency room at South Sunflower Hospital in Indianole, Mississippi, in 1975 and 1976, respectively. Additionally, *363 he received monthly payments ranging from $295 to $420 under the "G.I. Bill." On their Federal income tax returns for the calendar years 1975 and 1976 petitioners reported as income the amounts received by petitioner from his work in the emergency room and the amounts he received from UMC and VAH in connection with his residency. As employee business expenses for continuing education, petitioners deducted from their reported income $4,287 and $4,082 in the years 1975 and 1976, respectively. Respondent in his notice of deficiency to petitioners for 1975 decreased petitioner's employee education business expenses to $1,287 with the following explanation: Continuing Education (Books, Journals, fees, special courses, etc.) You claimed the following: Scholarship exclusion 300/mo or
$ 3,600.00
Dues
55.00
Journals
193.00
Parking
28.00
Rent
100.00
Food
311.00
Total - Per Return
4,287.00
$4,287.00
We have proposed to allow the following based on the information you provided us: Scholarship exclusion
$ 600.00
Journals
193.00
Dues
55.00
Parking
28.00
Rent
100.00
Food
311.00
Total Allowed
1,287.00
Adjustment
3,000.00
For the *364 scholarship exclusion, you were in school in Texas, two months in 1975, taking courses only, the remaining part of the year, you were at the University Medical Center in the Ophthalmology Residency Training Program. Amounts paid to interns and resident physicians by a hospital operated in conjunction with a state medical school are compensation for services and are not excludable from gross income as scholarship or fellowships. (See Revenue Ruling 68-520, 1968-2, C.B. 58.) See also Section 117 of the Internal Revenue Code.[2]
In his notice of deficiency for 1976, respondent increased petitioner's taxable income by $3,600 with the following explanation: Taxable income is increased by the exclusion of your educational stipend of $3,600.00. This represents compensation from your employer rather than an allowable educational expense. Revenue Ruling 57-386 amplified by Revenue Ruling 72-469. OPINON Section 117(a), I.R.C. 1954, [3] provides for the exclusion from gross income of amounts received *365 as a fellowship grant or as a scholarship. Section 117(b)(2) limits the exclusion for an individual who is not a candidate for degree to $300 a month for 36 months. Section 1.117-3(a), Income Tax Regs., defines a scholarship as an amount paid to a student to aid in pursuit of his studies. Section 1.117-3(c), Income Tax Regs., defines a fellowship grant as an amount paid to an individual to aid in the pursuit of study or research. Section 1.117-4, Income Tax Regs., provides that amounts representing compensation for employment services or payments for services subject to the direction or supervision of the grantor shall not be considered as amounts received as a scholarship or as a fellowship grant. In Bingler v. Johnson, 394 U.S. 741 (1969), the Supreme Court held this regulation valid. The Supreme Court found that the exclusion by the regulation of amounts received as compensation for services from the definition of scholarship and fellowship grants comported "with the ordinary understanding of 'scholarships' *366 and 'fellowships' as relatively disinterested, 'no-strings' educational grants with no requirement of any substantial quidproquo from the recipients." Id. at 751. Under the regulations, an amount is not excludable as a scholarship or fellowship grant unless the primary purpose of the grant is to enable the recipient to further his education rather than to compensate him for services. Brubakken v. Commissioner, 67 T.C. 249, 255 (1976). There is no evidence in this record concerning petitioner's activities while serving at VAH. It is incumbent on petitioner to show error in respondent's determination. Since there is no evidence in the record concerning the nature of petitioner's activities at the VAH, he has failed to establish that he is entitled to the claimed educational expense deduction of $300 a month for the months he served at VAH. Petitioner contends that he was of no effective use to UMC as an employee and that in fact his presence limited the number of patients that the staff ophthalmologists could treat. Thus, he argues that he was the recipient of a scholarship or fellowship grant which was properly excludable under *367 sections 117(a) and (b). It is respondent's position that, with the exception of the two-month period during 1975 in which petitioner took the basic science course in Houston, the payments by UMC were compensation for services rendered by petitioner. We agree with respondent. Dr. Johnson, the director of the opthalmology resident program at UMC, testified that in his opinion patient care would be more efficient without the residents at UMC. Additionally, he testified that in his opinion the teaching faculty could service all of the ophthalmology patients without help from the residents.Petitioner also testified that it was his opinion that UMC received no benefit from his services. However, the record as a whole in this case shows that the residents did contribute to patient care and that they were necessary to the efficient operation of the hospital. Petitioner as a resident completed case histories, did medical examinations, made tentative diagnoses, suggested medication, provided pre-operative and post-operative patient care, performed surgery and was frequently on call for emergencies. He also made rounds with the staff ophthalmologists. Furthermore, petitioner was plainly *368 necessary at UMC since, as he testified, UMC was not always able to grant his requests for vacation time because of their personnel needs. Petitioner's duties were not merely duplicative of the staff ophthalmologists; he was a necessary employee in the care of UMC patients. Apparently petitioner and Dr. Johnson believe that by taking into account the time the staff ophthalmologists spent teaching the residents the sum total of the residency program was one of lesser efficiency in patient care. This, however, is not the test. In Fisher v. Commissioner, 56 T.C. 1201, 1215 (1971), we dealt with this argument as follows: At the trial herein, the medical director of the Center testified that the Center "probably could operate [without residents] without increasing its staff" by having its staff members care for patients during periods previously spent teaching residents. We do not find that testimony convincing. The services performed by residents at the Center were extensive. Even if the hospital could "operate" without residents, we think it quite doubtful that the Center could continue to care for as many patients and as effectively as it could with their help. *369 Cf. Ethel M. Bonn, 34 T.C. 64, 71.[7] More fundamentally, even if the Center could do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory.
We find this reasoning in Fisher to be equally applicable in the instant case. Under his contract with UMC petitioner was treated as an employee. He was given the same amount with the same yearly raise as all the other residents without regard to financial need. This indicates that the payments were not scholarships or fellowships but compensation. Brubakken, supra at 259. Petitioner was entitled to sick leave, paid holidays, vacation, participation in the group health plan for employees and employer-purchased malpractice insurance. The enjoyment of fringe *370 benefits traditionally found in an employer-employee relationship indicates that the payments received were compensation. Anderson v. Commissioner, 54 T.C. 1547, 1552 (1970). UMC also withheld state and Federal income taxes and social security taxes from the amounts paid petitioner. Such treatment is an indication that the payments were compensation. See Proskey v. Commissioner, 51 T.C. 918, 924 (1969).[4]
Petitioners rely on Leathers v. United States, 471 F.2d 856 (8th Cir. 1972), *371 to support their position. Their reliance, however, is misplaced. The Leathers case held that as an appellate court its judgment should not be substituted for the jury determinations in the District Court "where such determinations are based upon conflicting and substantial evidence. [Fn. ref. omitted.]" Id. at 863. There are also substantial differences in the facts in the instant case and in the Leathers case. The instant case is factually more comparable to Parr v. United States, 469 F.2d 1156, 1157 (5th Cir. 1972), in which the Court stated with respect to a factual situation and argument comparable to the instant case: Taxpayer's proof of the purposes for which the hospital facilities are operated avails them nothing. The purposes for which the facilities are operated is relevant only insofar as it might possibly shade the purpose for which payments are made to Taxpayers. It is clear that Taxpayers were compensated for the services they performed. Each of them made rounds, saw patients, took histories, proposed diagnosis, gave pre and post-operative care, and assisted in and performed surgery under the supervision of faculty *372 members. The testimony was undisputed -- in fact it was offered by Taxpayers -- that these facilities would have had to hire other personnel to undertake these duties had they not been performed by Doctors Emerson and Parr. * * * In the instant case both Dr. Johnson and petitioner testified to services rendered by petitioner quite comparable to the services rendered by the residents in the Parr case. However, they stated as their opinion that increased personnel would not be required if the residents were not there and that the staff doctors would merely have to "work faster." However, the record as a whole shows that if the services performed by the residents had not been performed by them, either additional personnel would have been necessary to perform these services or the remaining personnel of the hospital would have had to perform additional duties. On the basis of this record as a whole, we conclude that petitioner was compensated by UMC for services rendered. Decisions will be entered under Rule 155. Footnotes
1. The record contains no contract for the July 1, 1974, through June 30, 1975, residency of petitioner.↩
2. The $600 scholarship exclusion allowed in the deficiency notice relates to the two-month study period petitioner spent in Houston, Texas.↩
3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years involved.↩
7. It is far from clear to us that the Center would continue to be as attractive to staff physicians if it ceased to be a teaching hospital. Cf. Marvin Flicker, 29 T.C.M. 1115↩, 1125, P-H Memo. 70-1218, 70-1230.
4. Petitioners make no arguments to distinguish the UMC payments petitioner received while in Pascagoula and Greenville from those received while at UMC.The record shows only that petitioner assisted the private ophthalmologists in Greenville and Pascagoula while continuing to receive the UMC resident payments. There is some indication in the record that UMC may have been paid some amount by Medicaid or Medicare for petitioner's services while he was in Greenville and Pascagoula. In any event, because of lack of sufficient evidence to show otherwise we conclude that the UMC payments petitioner received in Pascagoula and Greenville were compensation for services.↩