MICHAEL J. LARSEN and DERORA BERNSTEIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Larsen v. Commissioner
Docket No. 8676-71.
United States Tax Court
T.C. Memo 1973-239; 1973 Tax Ct. Memo LEXIS 51; 32 T.C.M. (CCH) 1118; T.C.M. (RIA) 73239; October 25, 1973, Filed Derora Bernstein, pro se. Jesse T. Mountjoy, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $286 in petitioners' Federal income tax for 1968. The only issue *52 is whether $2,666.67 received by Derora Bernstein as a teaching assistant at Ohio University is excludable from income as a "scholarship" or "fellowship" within the meaning of section 117. [1] 2 FINDINGS OF FACT Some facts have been stipulated and are incorporated herein by reference and found accordingly. Petitioners, Michael J. Larsen and Derora Bernstein, were husband and wife residing in Albany, Ohio, during the taxable year 1968. They filed their joint Federal income tax return with the district director of internal revenue, Cincinnati, Ohio, for that year. Michael J. Larsen is a petitioner herein only by virtue of having joined in that return. As used herein, petitioner will refer to Derora Bernstein. After receiving her B.A. degree in English from Oswego State College in June 1965, petitioner matriculated in the Graduate College of Ohio University and was awarded her M.A. degree in English in the spring of 1967. Immediately thereafter, petitioner began work toward a Ph.D. degree in English. On December 12, 1967, while a Ph.D. candidate, petitioner *53 was appointed a "Teaching Assistant," a position she held for each academic quarter involved in the taxable year 1968. A pamphlet entitled "Graduate Study in English" stated: The purpose of graduate study in English is to train qualified students for careers as college teachers or research scholars or, ideally, both. The ability to teach creatively is as rare 3 as the ability for brilliant research. Both abilities are equally valuable to the profession and to the individual, and graduate study should nurture both. Regular teaching is therefore a requirement for both the M.A. and Ph.D. degrees. The graduate faculty, programs, and courses at Ohio University represent what we believe to be a realistic combination designed to encourage and develop both teaching and scholarship without stifling either. * * * * * * One requirement is common to all our degree programs, and that is teaching. It is not possible to take either the M.A. or the Ph.D. without teaching at least one course per year during the period of residence. * * * Teaching [Assistants] teach one course per quarter, and Graduate Assistants and students holding tuition scholarships teach at least one course *54 per year, as do students receiving no form of financial aid. Everyone of course receives degree credit for teaching; those not receiving financial aid will find their graduate credit for teaching included in their tuition bills. Thus, every graduate student in Ohio University's English program spent part of his time teaching undergraduate classes. Ph.D. candidates who received teaching assistantships taught one section of freshman or sophomore English during each of the fall, winter, and spring quarters, whereas Ph.D. candidates who were not teaching assistants taught only one quarter per school year. In accordance with this program, petitioner taught English 103 (Introduction to Drama) in the winter and spring 4 quarters of the 1967-1968 school year and English 203 (Introduction to Drama) and Humanities 308 (Great Books) in the fall and winter quarters, respectively, of the 1968-1969 school year. During the school years 1967-1968 and 1968-1969, there were between 90 and 100 sections of freshman English courses offered by Ohio University. In the 1967-1968 school year, there were 89 teaching assistants and in 1968-1969 there were 82. Most teaching assistants taught one *55 freshman course each quarter. Approximately 20 to 25 taught two courses each quarter (freshman or sophomore level) and 5 to 10 taught one sophomore level course each quarter. During the two school years involved, there were 54 full-time faculty members in the Department of English. Had there been no teaching assistants, additional persons would have been hired to teach, but the number of teaching assistants was not directly geared to projected enrollment. The number of assistantships available was determined by the amount of money available to the Department of English. A student desiring to do graduate work in English first applied to the graduate school for admission. Applications for financial assistance could be made at that time. There were several types of financial 5 assistance for which every graduate student was eligible in 1968: 1. Teaching Assistantship. 2. Graduate Assistantship. 3. Residence Halls Assistantship. 4. Tuition Scholarships. 5. National Defense Education Act Fellowships. 6. Clippinger Fellowship. 7. Federal Work-Study Programs. These were all awarded competitively, and at least the first three types were based on academic *56 achievement rather than financial need. In the 1967-1968 bulletin for the graduate college, the teaching assistantship was described as follows (the 1968-1969 bulletin was substantially identical): FINANCIAL AIDS TEACHING, RESEARCH, AND GRADUATE ASSISTANTSHIPS A number of teaching assistantships, research assistantships, and graduate assistantships are available in the Graduate College of Ohio University. Persons receiving these appointments are selected on a basis or merit from students who have received the baccalaureate and/or master's degree from approved institutions and who wish to pursue work leading to graduate degrees. TEACHING ASSISTANTSHIPS carry a stipend of $2200 to $4200 (for three quarters) and a waiver of the comprehensive fee, with the exception of the $40 incidental fee, each quarter during the period of service. The teaching assistant is required to render 6 approximately 18 hours of instructional service per week, and is required to carry 9 to 13 quarter hours of graduate work. The general registration fee will also be waived during the summer quarters directly preceding and following the period of an appointment. Every teaching assistant who *57 was reappointed to another year received a $200 increase over the prior year's stipend. The reappointments were based on satisfactory progress toward the degree rather than simply on the quality of the appointee as a teacher. Some Ph.D. candidates in the English Department paid tuition and did the required teaching but were not paid for the teaching, some had w tuition remitted and did the required teaching but were similarly not paid therefor, and some (of which petitioner was one) had tuition remitted, taught, and were paid for teaching. Each time a Ph.D. candidate (whether or not a teaching assistant) taught, he or she was required to register for English 792, which is described as follows: ENGLISH 792 PROBLEMS IN TEACHING COLLEGE ENGLISH Teaching [Assistants] should register each regular quarter for 792 one hour only. Graduate students not on [assistantship] should register only the quarter(s) they are teaching: from one to five hours - as best fits their schedule and course load. * * * 7 * * * English 792 is a series of brief workshops meeting twice a quarter for each 100 level course offered that quarter, and for other courses staffed that quarter partly by *58 Teaching [Assistants] (e.g. 201, 308, or 309). The first such gathering - early in the first week of the term - will be to share syllabi, ideas, methods, resources, and bibliographies for teaching that particular course (usually with a particular set of books in common). The final meeting - the last week of classes - would resemble a post-mortem and would probably help each Teaching [Assistant] to write his own self and course evaluation, which he is responsible for turning into the graduate committee Chairman each quarter he teaches. The faculty member leading the workshop will be asked at the end of the term to summarize the resources and problems with that particular couse [sic] and to critique the set of books for the Supervisory Committee for Apprentice Teachers, so the course can be made more beneficial in future quarters. * * * Since there is no stipend for those graduate students teaching a course but not on an assistantship, the up to 5 hours of credit is a form of payment - intangible and inedible though it may be. For English 792, there were assigned books to read and papers to write. Although presided over by a regular faculty member, the principal purpose *59 of English 792 was to afford teaching assistants the opportunity to share ideas, methods, and resources for teaching their classes. There was occasional visitation by the English 792 faculty member to the classes taught by teaching assistants in 1968 and there was some supervision via faculty - teaching assistant conferences. 8 In teaching his or her class, a teaching assistant had a syllabus to follow which was prepared by the English Department faculty and which stated the textbooks to use, the number of papers to assign, and the procedures to follow. It was possible to deviate from the syllabus, subject to approval from the faculty supervisor. Teaching assistants were not considered to be members of Ohio University's faculty and they did not receive any faculty benefits. They were not given faculty library or parking privileges and could not participate in insurance or retirement plans. They did not receive faculty identification cards which, among other things, yielded discounts in local bookstores. In Ohio University's controller's office, the stipends paid to petitioner were treated as wages and salaries. Stipends were charged to the same account as faculty salaries *60 - an account to which "pure scholarships" could not be charged. Petitioner was paid $2,666.67 in 1968 and $212.16 was withheld from this amount for Federal income tax. On the return for the taxable year at issue, wages and salaries were listed as $3,564.69 and a 9 miscellaneous itemized deduction [2] of $2,666.67 was claimed. ULTIMATE FINDING OF FACT The amounts paid to petitioner constituted taxable compensation for services rendered. OPINION This case is governed by the provisions of section 117 [3] dealing with the exclusion from gross income of scholarships and fellowships. The application of that section to graduate work activities, such as those 10 involved herein, has stimulated much controversy, commencing with Chander P. Bhalla, 35 T.C. 13 (1960), and continuing through Elmer L. Reese, Jr., 45 T.C. 407 (1966), affirmed per curiam, 373 F.2d 742 (C.A. 4, 1967), to the recent decision of this Court in Robert Henry Steiman, 56 T.C. 1350 (1971). *61 We see no need to regurgitate all of the analyses to which the language of that section has been subjected or of its legislative and historical background which is set forth in Bingler v. Johnson, 394 U.S. 741 (1969), and Elmer L. Reese, Jr., supra.It is sufficient for our purposes herein to note that section 117 presents a labyrinthine problem which can be met only in terms of the particular facts and circumstances of each case. Stephen L. Zolnay, 49 T.C. 389, 395 (1968). See also Stewart v. United States, 363 F.2d 355 (C.A. 6, 1966). *62 Section 117 allows an individual to exclude any amount received as a scholarship or fellowship grant from the coverage of section 61(a). Section 117(b) (1) provides an exception to this exclusion in the case of 11 an indivudual who is a candidate for a degree at an educational institution for the portion of any amount received which represents payment for teaching or other services in the nature of part-time employment required as a condition to receiving the scholarship or fellowship. If the teaching or other services are required of all candidates for a particular degree, as a condition to receiving that degree, however, the exception to the general rule of exclusion does not apply. Petitioner presents a straightforward proposition: she was required to teach as a condition to qualifying for her Ph.D degree; all candidates for Ph.D degrees were required to teach; therefore, the exclusion provisions of section 117 were satisfied. But the situation is not as straightforward as petitioner suggests. Rather, what we have here is the type of "dual condition" situation which has perplexed this Court many times and which we discussed in Robert Henry Steiman, supra, 56 T.C. at 1354, *63 and Stephen L. Zolnay, supra, 49 T.C. at 396. See also Elmer L. Reese, Jr., supra, 45 T.C. at 415-416. What we said in Zolnay bears repetition: * * * [The] threshold inquiry in cases of the type involved herein is whether there is a scholarship or fellowship within the intendment of section 117(a). We [confirm] the use of the primary-purpose test applied to the objective facts and circumstances of each situation. * * * 12 * * * [The] requirements of section 117 are not satisfied merely because all degree candidates are required to perform services. * * * Section 117 obviously does not require that precisely the same services be rendered by all degree candidates. However, the requirement of reasonably equivalent activity, be it research or another type of service, seems to us to be, not only the touchstone of section 117(b), but an important element in determining the extent to which payments constitute a scholarship or fellowship in the first place. Admittedly, within limits, there may be quantitative and qualitative variations among the students, but a reasonable identity of the work pattern of the degree candidates is an essential precondition. *64 [49 T.C. at 396-397.] It is the requirement of reasonably equivalent activity which causes petitioner to fail here. Based on our findings, we derive a different syllogism: all candidates for postgraduate degrees were required to teach at least one quarter per school year regardless of whether they qualified for a stipend; [4] petitioner was required to teach three quarters per school year to receive her stipend; therefore, the exception to the exclusion provisions of section 117 applies and the amount of petitioner's stipend is includable in her gross income. 13 Whatever flexibility may inhere in the determination of a "reasonable identity of the work pattern," we do not think that the requirement has been met herein. The gap between the instant situation and the "similar research" and "same service training" findings, which were the critical elements in Chander P. Bhalla, supra, and Robert Henry Steiman, supra, is too great to enable petitioner to draw sustenance from those cases. [5]
*65 We think petitioner must also fail in the broader focus of this case. Her teaching activities were primarily for the benefit of the Ohio University Department of English. Petitioner makes a forceful argument that teaching was her chosen profession and the required teaching provided her with great educational training and experience in that profession. This may well be true, but the existence of such benefits does not prevent our finding that the payments were primarily 14 for the benefit of the University. Aloysius J. Proskey, 51 T.C. 918, 925 (1969); Ethel M. Bonn, 34 T.C. 64, 73 (1960); cf. Robert Henry Steiman, supra. Petitioner also argues that her teaching did not make the faculty's load lighter but required extensive additional work and supervision by her faculty adviser. Even if this element were determinative (which we do not think it is), the record clearly indicates that faculty members only occasionally vistited petitioner's classes and that, without teaching assistants, more faculty would have been hired. See page 4, supra. The fact is that petitioner exercised almost complete control over the classes she taught just *66 as any regular faculty member would have done. That she was not selected simply to satisfy the teaching demand generated by a new class in freshman English and that she did not receive faculty benefits or privileges are not sufficient to tip the scales in her favor. Cf. Robert Henry Steiman, supra, 56 T.C. at 1356; Stephen L. Zolnay, supra, 49 T.C. at 398-399. The University regarded petitioner as an employee. The amounts paid her were treated as wages and salaries paid for services rendered and were paid from a part of the University's budget from which "pure 15 scholarships" (those with no services required) could not be paid. Edward A. Jamieson, 51 T.C. 635 (1969); Stephen L. Zolnay, supra, 49 T.C. at 398. [6]
We recognize that there are several factors herein which, if considered independently, might point toward a different conclusion. We do not, however, consider each factor in a vacuum - we consider the totality of facts and circumstances. *67 On this basis, we conclude that petitioner was paid to work and not to study. Accordingly, the amount she received in 1968 was taxable compensation paid for services rendered and did not have the "normal characteristics associated with the term "scholarship."" Stephen L. Zolnay, supra, 49 T.C. at 399; Elmer L. Reese, Jr., supra, 45 T.C. at 413. [7]
Decision will be entered for the respondent. Footnotes
1. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended. ↩
2. The "scholarship" was first included in gross income and then taken as an itemized deduction. If it does qualify under section 117, it is an exclusion and should have been treated as such. ↩
3. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e) (4)), or (B) as a fellowship grant, including the value of contributed services and accommodations; * * * * * * (b) Limitations. - (1) Individuals who are candidates for degrees. - In the case of an individual who is a candidate for a degree at an educational institution (as defined in section 151(e) (4)), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph. ↩
4. Some received remission of tuition, others did not even receive that. ↩
5. Other factual differences serve further to distinguish Steiman, notably the keying of the payments to financial need, the close supervision of the taxpayer's work, and the clear evidence that such supervision did not relieve the demand for staffing. ↩
6. We note that the University withheld income taxes from amounts paid to petitioner but attach no significance thereto. Chander P. Bhalla, 35 T.C. 13, 17-18↩ (1960).
7. We note that taxpayers in a position comparable to that of petitioner have, with the exception of the taxpayer in Robert Henry Steiman, been singularly unsuccessful in obtaining the benefits of section 117. Worthington v. Commissioner, 476 F.2d 589 (C.A. 10, 1973), affirming a Memorandum Opinion of this Court; Steinmetz v. United States, 343 F. Supp. 384 (N.D. Cal. 1972); Edward A. Jamieson, 51 T.C. 635 (1969); Kenneth J. Kopecky, T.C. Memo. 1968-215; Donald R. DiBona, T.C. Memo. 1968-214↩.