ROBERT ABRAMS, JR., and CLIFFORD ABRAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abrams v. Commissioner
Docket No. 3541-73
United States Tax Court
T.C. Memo 1974-165; 1974 Tax Ct. Memo LEXIS 157; 33 T.C.M. (CCH) 722; T.C.M. (RIA) 74165; June 24, 1974, Filed. A. Glenn Sowders, Jr., for the petitioners. Joe K. Gordon, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge : Respondent determined a deficiency of $1,393.53 in petitioners' Federal income tax for 1970. The only issue is whether amounts received by both Robert and Clifford Abrams under the same program are excludable from income as "scholarship" or "fellowship" grants within the meaning of section 117. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by reference and found accordingly. *158 Petitioners Robert Abrams, Jr. (hereafter Robert) and Clifford Abrams (hereafter Clifford) are, and at all times pertinent to this proceeding have been, husband and wife. At the time they filed their petition herein, petitioners resided in Kansas City, Missouri. For the taxable year 1970, petitioners' joint Federal income tax return was filed with the internal revenue service center in Kansas City, Missouri. During 1970, Southern Illinois University (SIU), the Junior College District of St. Louis - St. Louis County, Missouri (JCD), the Ford Foundation (Ford), and the National Restaurant Association (NRA) cooperated in a project known as the Community College Cooperative Internship Program of the Junior College District Teaching Internship Program (the Project). The Project was designed to assist in the preparation of instructors to teach in community colleges and post - secondary technical institutions. It was further designed to accommodate both those who planned to teach occupational courses and those who planned to teach academic courses required in an occupational curriculum. Every participant in the Project was required to spend one semester as a teaching intern at *159 a junior college in the JCD. An announcement describing the program states: The internship experience is a comprehensive one which includes the following elements: Responsibility for two junior college classes during the semester, under the supervision of a master teacher. Observation of the classes of several of the junior college faculty members. Visitation and orientation to the major areas of junior college organization (e.g., student personnel services, admission and registration, instruction, etc.). Participation in departmental and general faculty meetings. Independent study of special problems (e.g., case studies of students with special difficulties). Field assignments (e.g., visits to businesses, industries, and other agencies related to the intern's area of teaching interest). Regular twice - weekly seminars involving all the interns and related to general teaching problems, as well as to special concerns developing during the internship experience. During the semester, each intern taught two junior college classes under the supervision of a "master teacher" who retained the ultimate responsibility. During that semester, the supervising teacher's *160 load was reduced by one class to allow time to work with the intern. One class is 20 percent of a normal teaching load. Although the amount of time the supervisor actually spent in the classroom varied, each petitioner conferred with his supervisor several times per week on methods, materials, problems, etc. The final grades were prepared by the petitioners, but were turned in to the supervisor for approval. In order to improve their own teaching, petitioners observed and evaluated other teachers in addition to attending the seminars twice weekly. The overall objective of the Project was to produce a more effective community college teacher. To this end, the interns were exposed to many aspects of the college in addition to teaching. The purpose of this aspect of the Project was to teach the intern to utilize the system in the most effective manner. In order to achieve this purpose, each intern's program was tailored to provide him with the skills that would be required of a full-time teacher in his discipline. The funding for the Project came principally from Ford, which provided $500,000. The necessary balance, approximately $400,000, was supplied by SIU and the JCD. In *161 addition, the NRA provided $2,000 stipends [2] for a number of interns with hotel, motel, and restaurant experience in the program. Ford was furnished regular reports from the directors of the project on both the SIU and JCD levels and from the interns who prepared reports on each of the various aspects of the Project. Although they were not treated differently, the interns came to the Project from two different sources. The pre-service program was designed to attract older, more experienced persons who had been successful in business or industry, but who had no previous teaching experience, into teaching. The other source of interns was the masters degree programs at SIU. Students from SIU could gain teaching experience and earn up to 12 quarter hours of credit by spending a semester in the JCD. Every intern received a stipend. Some interns, such as Robert, who had hotel, motel, or restaurant experience received an additional $2,000 stipend from the NRA. Moreover, pre-service interns *162 and interns in a masters program received different stipends. In order to attract the older, experienced people into the pre-service internship, the stipend had to be higher than for a masters candidate because pre-service interns generally had families and had been living or higher incomes. The JCD salary schedule was used to determine the stipends as a means of meeting the interns' financial requirements. During the years of the Project, the community colleges at which the interns taught never reduced their full-time faculty. They did, however, require fewer part-time teachers during those years. The interns were not treated as faculty for disciplinary procedure purposes and were not eligible for the faculty medical insurance plan, but they were entitled to use the faculty parking lot. At the completion of their semester, interns had no obligation to remain in the JCD. In fact, the project director sent a directory of interns to over 900 schools which might have been interested in hiring them as teachers. Nor did those who received the additional stipend from the NRA have any obligation to the NRA. Robert was a pre-service intern at a community college in the JCD from *163 January to June 1970. He was not a candidate for a masters degree at that time.Following his semester as an intern, he applied to the SIU masters degree program, was accepted, and received retroactive credit for his internship. Clifford was a candidate for a masters degree at SIU and an intern from September 1970 through January 1971. On their 1970 return, petitioners excluded from gross income as "educational grants" the amounts of $4,810 in the case of Robert and $1,600 in the case of Clifford. Respondent determined that the stipends did not qualify under section 117 and included them in their gross income. ULTIMATE FINDING OF FACT The amounts paid to petitioners by the Project were "scholarships" or "fellowships" within the meaning of section 117. OPINION The sole question requiring our decision herein involves the purely factual inquiry into whether the amounts received by petitioners as interns in the Project should be excluded from gross income under section 117.[3] While the statute clearly applies to exclude "scholarship" and "fellowship" grants, nowhere in the Code are these terms defined. We have previously confirmed the use of the primary purpose test, as *164 applied to the objective facts and circumstances of each situation, in order to determine qualification. Stephen L. Zolnay, 49 T.C. 389, 396 (1968); Elmer L. Reese, Jr., 45 T.C. 407, 411 (1966), affirmed per curiam, 373 F.2d 742 (C.A. 4, 1967). When reduced to basics, the question becomes: Was the taxpayer paid to work or to study? If he was paid to work, the amounts paid him represent compensation. See Bingler v. Johnson, 394 U.S. 741 (1969), and section 1.117-4(c), Income Tax Regs.
In making the determination, we cannot claim infallibility, for this is another of those areas of our tax laws where precisional line-drawing is impossible. Stephen L. Zolnay, supra, 49 T.C. at 395. We have closely examined all the facts and circumstances of the instant situation (see Chander P. Bhalla, 35 T.C. 13, 17 (1960)) and have *165 concluded that petitioners herein were paid to study. Petitioners' teaching duties, and, indeed, their whole program, were carefully tailored to give them the background they would find necessary upon entering their teaching careers. In addition to teaching, the interns participated in many different activities and special projects, all designed to improve them as community college teachers. Moreover, petitioners were under no obligation to teach in the JCD when their internships were completed. Compare Bingler v. Johnson, supra, 394 U.S. at 757. There was not even a requirement that they remain in the teaching profession. They could seek any kind of employment anywhere they desired. Thomas P. Phillips, 57 T.C. 420, 427 (1971). To be sure, the junior colleges benefited from the teaching services of the petitioners in the sense that they needed fewer part-time teachers to carry the full-time faculty's overload. But this benefit was only incidental. The primary aim of the Project was to improve the interns' teaching skills, not to staff the faculty. Although petitioners taught six hours per week, most of their time was spent in other activities *166 such as attending seminars, administrative, department, and faculty meetings, observing other teachers, and conferring with their "master teachers." The "master teachers" were constantly advising and overseeing their interns and were ultimately responsible for the interns' course, its content, examinations, and final grades. This added strain on the "master teacher" more than offset the lightening of his course load. Robert Henry Steiman, 56 T.C. 1350, 1356 (1971). Our evaluation of the entire record leads us to conclude that the amounts received by petitioners as interns in the Project during the year in controversy have the "normal characteristics associated with the term "scholarship."" Elmer L. Reese, supra, 45 T.C. at 413. To reflect the fact that Robert was not a candidate for a degree at the time he received the stipend, his exclusion is limited to $1,500. Section 117(b) (2). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954. ↩
2. The use of the words "stipend," "fellowship," or "scholarship" is merely for the convenience of the Court. Such use is not intended to resolve or imply our ultimate determination. ↩
3. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e) (4)) (B) as a fellowship grant, * * * ↩