MAX D. OLICK AND HILDA OLICK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4017–77.    Filed December 17, 1979.

*C. Kevin McCarthy,* for the petitioners.
*Michael R. McMahon,* for the respondent.

HALL, *Judge:* Respondent determined a $588.58 deficiency in

petitioners' income tax for 1973, plus an addition to tax for negligence under section 6653(a)[1] of $29.43. Due to a concession by respondent, the issues remaining for decision are:

(1) Whether certain payments received in 1973 by Max D. Olick while he was a teacher-in-training in the Alaska Rural Teacher Training Corps program qualified as a scholarship excludable from gross income;

(2) Whether petitioners' underpayment of tax in 1973 was due to negligence; and

(3) Whether petitioners are entitled to attorneys' fees and costs.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time they filed their petition, Max D. and Hilda Olick were residents of Bethel, Alaska. Hilda is a party only by virtue of having filed a joint return with her husband. When we hereafter refer to petitioner, we will be referring to Max.

In 1973, petitioner was a registered sophomore at the University of Alaska and a candidate for a bachelor of education degree. The two prerequisites for obtaining a bachelor of education degree were the accumulation of a sufficient number of academic credits and the fulfillment of a student teaching requirement. The traditional method of earning the degree was to attend academic classes on the university campus and to complete the student teaching requirement during one semester of the candidate's senior year. A degree candidate following the traditional progression was not compensated for his student teaching time.

At the time of petitioner's enrollment at the University of Alaska there existed an alternate route leading to a bachelor of education degree. This involved participation in the Alaska Rural Teacher Training Corps (ARTTC) program.[2] Petitioner chose this alternative.

The ARTTC program, under the aegis of the Alaska State-

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

[2] At the time of trial, this program was still in effect but had been renamed the "Field Based Cross Cultural Program."

operated school system (school system), was designed to encourage Native Alaskans[3] to enter the teaching profession, to train teachers for low income areas, and to obtain the services of the program's participants.[4] Native Alaskan students, like petitioner, were assigned to the rural communities of Alaska. There they combined the pursuit of a degree in education with extensive on-the-job training. It was the hope of the school system that the program would lead to bachelor of education degrees for those involved and that they would pursue careers as teachers in the school system.

To carry out the ARTTC program, the University of Alaska established what was essentially a "university on wheels." University professors were placed in field centers and traveled among rural communities providing academic instruction and supervision to those undergraduates participating in the program. Those undergraduates were referred to as teachers-in-training (trainees). To the extent that the academic courses entailed subjects that could be applied to actual classroom situations, e.g., a course in the teaching of reading, the trainee was placed in a school in his rural community to practice what he had learned. During those semesters in which the trainee was in the classroom, he spent approximately 5 hours per day there.

A trainee at petitioner's level of academic study functioned as a teacher's aide during his periods in the classroom. He helped individual students in those areas in which he was receiving academic training. Under no circumstances, however, was he left in charge of a classroom. There was always a certified teacher present to help the trainee, if necessary. The trainee did not teach whole classes nor did he assign grades. Furthermore,

---

[3]Native Alaskans are those individuals who are at least 25 percent Eskimo, American Indian, or Aleut.

[4]The ARTTC program coincided with the Federal Teacher Corps Program, Higher Education Act of 1965, tit. V, sec. 511, 79 Stat. 1255, 20 U.S.C. sec. 1101, et al. (1976). The Teacher Corps program was designed (a) to strengthen the educational opportunities available to children in areas having concentrations of low-income families, (b) to attract into the teaching profession and to service in such areas the most able individuals, and (c) to provide a unique training opportunity for future teachers of the disadvantaged. S. Rept. 623, to accompany H.R. 9567 (Pub. L. 329), 89th Cong., 1st Sess. (1965), reprinted in [1965] U.S. Code Cong. & Adm. News 4068. The Teacher Corps program was open to experienced teachers, recent graduates without teaching experience, and undergraduates who had completed at least 2 years toward an undergraduate degree. 20 U.S.C. sec. 1103(a)(1) (1976). Although the emphasis of the ARTTC program and the Teacher Corps program differed with respect to the ethnic makeup of its participants, the goals of the two programs were basically the same: to recruit qualified individuals to teach disadvantaged children; to provide valuable on-the-job training; and to provide current teaching services to disadvantaged children. Petitioner was ineligible for the Teacher Corps program due to his sophomore standing.

the trainee did not serve as a replacement for a teacher whom the school system would otherwise have hired.

The trainees received academic credits for those courses attended while residing in the rural areas, and their student teaching requirement was fulfilled by their work in the classroom. Although the student teaching arrangement under the ARTTC program differed from that under the traditional undergraduate program, the number of academic credits earned by student teaching in either program was the same.[5] Under neither program were the participants permitted to be alone in the classroom; a certified teacher was always present.

In August 1973, petitioner entered into an "Agreement for Financial Support" (agreement) with the school system to participate in the ARTTC program. This agreement provided that petitioner would receive a monthly stipend of $614. The amount of the stipend was determined in accordance with a stipends schedule approved by the school system. The payment of this stipend was conditional on (1) petitioner's performance of the "duties of teacher-in-training in the rural or multicultural schools of Alaska," (2) petitioner's attendance at any summer program of academic training prescribed by the school system, and (3) petitioner's payment of all Federal, State, and local taxes incurred in the performance of the agreement. The stipend was not conditioned on the amount of time the trainee served as a teacher's aide. The agreement covered the period July 1, 1973, to May 31, 1974.

In addition, the agreement provided for termination if petitioner failed to discharge his responsibilities as a teacher-in-training, if he failed academically, if funds for the ARTTC program became unavailable, or if the parties mutually consented.

The agreement explicitly disavowed any obligation "to offer continuing employment" to the petitioner. Similarly, the petitioner was not obligated to seek or accept employment with the school system if he obtained a bachelor of education degree.[6]

During 1973, petitioner received $2,726 pursuant to the

---

[5]Unlike a candidate in the traditional program who spends only one semester student teaching, a trainee in the ARTTC program is available for student teaching in each semester of his undergraduate years. Although the record does not disclose exactly how many semesters a trainee might be placed in the classroom, such placement did occur with some frequency.

[6]Petitioner dropped out of the ARTTC program and the University of Alaska prior to obtaining his degree. He did not become an employee of the school system.

agreement. The school system did not withhold any social security or Federal withholding taxes.[7] Instead, a Form 1099 was issued to each trainee for the amount received subsequent to June 30, 1973. The trainees, however, were notified to include as income on their Federal tax forms the amount shown on the Form 1099.

On his 1973 return, petitioner did not report as income the $2,726 received from the school system. In his statutory notice, respondent determined that the excluded amount was includable income and that petitioner was subject to an addition to the tax for negligence under section 6653(a).

## ULTIMATE FINDING OF FACT

The stipend received by the petitioner as a teacher-in-training constituted a scholarship rather than compensation for services rendered.

## OPINION

The first issue is whether petitioner is entitled to exclude from gross income $2,726 received during 1973 while a teacher-in-training (trainee) under the Alaska Rural Teacher Training Corps (ARTTC) program. Respondent asserts that this amount represented compensation for services performed. Petitioner contends that the amount excluded was a scholarship, and we agree.

Section 117(a)(1) excludes from gross income amounts received as a scholarship at an educational institution. Under section 117(b)(1), this exclusion does not apply to "any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant." In those situations in which "teaching, research, or other services are required of all candidates * * * for a particular degree as a condition to receiving such degree" such services are not regarded as part-time employment. Sec. 117(b)(1).

From the face of the statute it may appear that if the performance of a service, such as teaching, is both required to

---

[7]According to Denis Michael Murphy, director of the ARTTC program during 1973, the Social Security Administration had ruled that the stipends received by the trainees were not subject to the social security tax.

receive a stipend and is a standard requirement to obtain a degree, then any amount received is automatically excludable from gross income. But it is well settled that such is not the case. Inquiry into the applicability of the standard requirement exception under section 117(b)(1) becomes necessary only if it is initially determined that the payments in question have the attributes of a scholarship. See, e.g., *Steiman v. Commissioner*, 56 T.C. 1350, 1354 (1971); *Reese v. Commissioner*, 45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). If the payments do not possess such characteristics, no exclusion is available whether or not the services rendered were required of all candidates for a particular degree.

Nowhere in the Code is the term "scholarship" defined. The regulations, however, define the term as "an amount paid or allowed to, or for the benefit of, a student * * * to aid such individual in pursuing his studies." Sec. 1.117–3(a), Income Tax Regs. Conversely, the regulations provide that payments made as compensation for present or future employment services are not excludable as a scholarship. Sec. 1.117–4(c)(1), Income Tax Regs. More precisely, section 1.117–4(c)(1), Income Tax Regs., states:

Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\* \* \* \* \* \* \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of Sec 1.117–2,[8] any amount paid or allowed to, or on behalf of, an individual to enable him to

---

[8]Sec. 1.117–2(a), Income Tax Regs., provides:

(a) *Individuals who are candidates for degrees*—(1) *In general.* Under the limitations provided by section 117(b)(1) in the case of an individual who is a candidate for a degree at an educational institution, the exclusion from gross income shall not apply (except as otherwise provided in subparagraph (2) of this paragraph) to that portion of any amount received as payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or fellowship grant. Payments for such part-time employment shall be included in the gross income of the recipient in an amount determined by reference to the rate of compensation ordinarily paid for similar services performed by an individual who is not the recipient of a scholarship or a fellowship grant. A typical example of employment under this subparagraph is the case of an individual who is required, as a condition to receiving the scholarship or the fellowship grant, to perform part-time teaching services. * * *

(2) *Exception.* If teaching, research, or other services are required of all candidates (whether or not recipients of scholarship or fellowship grants) for a particular degree as a condition to receiving the degree, such teaching, research, or other services on the part of the recipient of a scholarship or fellowship grant who is a candidate for such degree shall not be regarded as part-time employment within the meaning of this paragraph. Thus, if all candidates for a particular education degree are required, as part of their regular course of study or curriculum, to perform part-time practice

pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. * * *

The Supreme Court upheld the validity of these regulations stating that the definitions contained therein comport with the "ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." *Bingler v. Johnson,* 394 U.S. 741, 751 (1969).

We first look to see if petitioner's services as a teacher's aide constituted a substantial quid pro quo for his stipend. See *Adams v. Commissioner,* 71 T.C. 477 (1978). Petitioner, a sophomore, functioned as a teacher's aide during those periods when he was in the classroom. He helped individual students in those areas in which he was receiving academic training. In other words, he was there to practice what he was learning. He fulfilled his student teaching requirement while functioning as a teacher's aide. Petitioner's services were dispensible in that his absence would not create any additional burden for the permanent teachers. In the absence of petitioner, the services he would have rendered would not have been performed at all and the educational process would have continued smoothly. Petitioner's placement in the classroom did not depend on whether a permanent teacher needed help, but rather on what academic courses he was then taking. In these respects, this case is clearly distinguishable from the numerous internship and resident cases we have decided. E.g., *Fisher v. Commissioner,* 56 T.C. 1201, 1215 (1971); *Brubakken v. Commissioner,* 67 T.C. 249, 256 (1976). In those cases, much of the work done by the intern or resident

---

teaching services, such services are not to be regarded as part-time employment within the meaning of this paragraph.

would otherwise have had to be done by permanent staff, and the staff's burden would have been substantially increased had they no assistance from interns and residents. Finally, the nature, extent, and value of the services petitioner performed were limited, inasmuch as he was only a sophomore trainee during the year in issue. Under the circumstances, we conclude that petitioner's services as a teacher's aide were not a substantial quid pro quo for his stipend.

Furthermore, we conclude that the primary purpose of the stipend paid to petitioner was to permit him to further his education and training, and not to compensate him for services rendered. See *Adams v. Commissioner, supra* at 483–484; *Steiman v. Commissioner, supra* at 1354; *Zolnay v. Commissioner*, 49 T.C. 389, 396 (1968). Determination of the primary purpose of the payments is a factual question (see *Steiman v. Commissioner, supra* at 1355) on which petitioner bears the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Where the activities of the trainee are beneficial to the trainee's education as well as to the fulfillment of the grantor's educational responsibilities, precise line-drawing is impossible. We have, however, closely examined the facts and circumstances here and have concluded that the primary purpose of the stipend was to train and educate petitioner.

A number of considerations lead to this conclusion. Initially, the close relationship of petitioner's academic training to his classroom involvement indicates the educational value of these activities to the trainee. Petitioner's placement and duties in the classroom did not depend upon which child needed help in a certain subject or which permanent teacher needed assistance. Rather, his classroom activities were completely dictated by the current content of his academic courses. The classroom was a forum in which to train and develop.

Second, the apparent limitations of trainees like petitioner, who have not yet completed two years of their undergraduate training, indicate that the primary purpose of the ARTTC program, at least with respect to those trainees in their freshman and sophomore terms, was to train and develop them. If the school system's primary purpose had been to obtain the services of qualified teacher's aides, it probably could have done so more efficiently by hiring experienced, full-time employees.

Third, the extent to which petitioner's activities were supervised emphasizes the instructional nature of the entire program. Supervision was provided by the university professors and the permanent teachers in whose classrooms the trainees were placed. The trainee was never left unsupervised in the classroom nor could he make authoritative decisions such as assigning grades. In prior cases, we have noted the burden of supervisory work may offset whatever benefits a grantor may otherwise realize from a trainee's services. See *Steiman v. Commissioner, supra* at 1356.[9] Although no precise quantitative comparison of the benefits and burdens to the school system of petitioner's participation in the ARTTC program is possible, it appears that the benefits to the school system were not so significant as to warrant the conclusion that the stipend was primarily for services rendered. See *Steiman v. Commissioner, supra* at 1356.

Fourth, the emphasis of the ARTTC program and, hence, the primary objective of the payments was educational. A stated purpose of the program was to train individuals, like petitioner, to become teachers in low-income, rural communities. Although the program had other purposes, the educational purpose was primary. The other stated purposes[10] were not attainable unless the trainees were qualified, that is, adequately trained. Given the "learning curve" associated with any new experience, much of this training and development was necessarily concentrated in the first year or two of the program. Therefore, the major benefits to the school system came later.[11]

No doubt petitioner's activities benefited the grantor. Given the school system's attempt to elevate the educational opportunities in the low-income areas, it is hard to believe that the school system would place additional net burdens on an educational system already ill equipped to carry out its functions. But, the mere presence of a benefit to the school system does not mean that the primary purpose of the stipend was to reap the

---

[9]See also *Abrams v. Commissioner*, 33 T.C.M. 722, 43 P-H Memo T.C. par. 74,165 (1974).

[10]Recruiting the trainees for permanent employment and obtaining their current services as teacher's aides were the other stated purposes.

[11]Petitioner was being trained not only as a teacher but as a teacher specializing in the low-income, rural communities of Alaska. To adequately train for such a career, trainees, like petitioner, were required to live in such rural communities. To the extent that such living conditions were in themselves fundamental to petitioner's training and development, any portion of the stipend representing a living allowance was also paid primarily to educate and train petitioner.

fruits of the trainee's activities. See sec. 1.117–4(c)(2), Income Tax Regs.[12] The primary purpose of the payments and not the incidental benefits derived from such payments is determinative.

Respondent argues that the student teaching requirement under the ARTTC program was not reasonably equivalent to the requirement in the traditional program and, therefore, the stipend represented compensation for the additional services performed by the trainees. Respondent cites *Logan v. United States*, 518 F.2d 143, 147–148 (6th Cir. 1975), for support.[13] If we were to use as our measuring stick the number of hours spent in the classroom by each degree candidate, then the participants in the ARTTC program would not have similar totals to those compiled by traditional degree candidates. We reject this purely quantitative approach and see no reason to challenge the judgment of the University of Alaska with respect to the equivalence of the student teaching requirements in each program. The University has determined that the classroom exposure under each route satisfies the same student teaching requirement and merits the same number of academic credits. We accept this determination of relative equivalence. We therefore hold that the primary purpose of petitioner's stipend was to educate and train him in his individual capacity and not to compensate him for his activities as a teacher's aide.

Alternatively, respondent argues that we need not examine the academic control of petitioner's instruction program or the nature and extent of the services he was required to perform in order to determine that his grants were not scholarships. Under this theory, we need merely examine the grantor's motive in making the grant. If the motive falls short of disinterested generosity and is tinged with a selfish desire to swell the ranks of the grantor's professional employees, then it cannot be a scholarship. Respondent cites *Ehrhart v. Commissioner*, 57 T.C. 872 (1972), affd. 470 F.2d 940 (1st Cir. 1973), and *MacDonald v. Commissioner*, 52 T.C. 386 (1969), for this proposition.

In *Ehrhart*, the petitioners were actuarial employees of life insurance companies engaged in a work-study program. This included alternative stints at their companies' offices and in

---

[12]See also *Abrams v. Commissioner, supra.*
[13]See also *Larsen v. Commissioner*, 32 T.C.M. 1118, 42 P-H Memo T.C. par. 73,239 (1973).

subsidized academic studies at an insurance-industry-sponsored program for insurance company employees at the Northeastern University Graduate School of Actuarial Studies. Petitioners' employers paid petitioners' "living allowances" while they were at Northeastern. We held that the entire academic program "represented a recruitment and training tool" of the life insurance companies who collectively sponsored it, and did not constitute scholarships. (57 T.C. at 880.)

In *MacDonald v. Commissioner, supra,* the petitioner was an engineering employee of the International Business Machine Co. (IBM) participating in an advanced education program established by the company. The program was initiated by IBM for the explicit purpose of obtaining the skills developed as a result of the advanced education. To insure this, the petitioner's field of graduate study was subject to approval by IBM. Although the petitioner was not required to work for IBM during his course of study, he was obligated to maintain contact with the company. IBM did not extract any written commitment from the petitioner to return as an employee upon completion of his studies, but the company "explicitly stated that the employee was 'expected to return to the sponsoring division [of IBM].' " (52 T.C. at 387.) Petitioner did eventually return to IBM. On these facts, we held that IBM's "clear expectation" of the employee's return meant that the stipend was primarily for the benefit of the grantor.

Both *Ehrhart* and *MacDonald* must be read in the light of their facts. Both cases dealt with special academic programs established by corporations expressly to meet their recruitment needs, tailored to those specific needs, open only to existing employees of sponsoring corporations, and requiring contact with the sponsoring employers throughout the academic program. Such programs were "primarily for the benefit of the grantor." We do not, however, accept respondent's invitation to read these cases so broadly that a mere recruitment motive, without more, suffices to bar a grant from scholarship status. To test the proposition that the recruitment motive alone is fatal, we might consider the case of a traditional academic institution in an area dominated, perhaps, by a single employer which recruits many scientific or engineering graduates at the institution and endows ordinary academic scholarships in the schools from which it draws its recruits, for the frank purpose of swelling its own pool of potential recruits. Were the donor's

motive, without more, fatal to scholarship status, the anomalous result would be that when the academic dean awarded a scholarship to one student, funded by its regular endowment funds, it would be tax free, but when he awarded the company-sponsored but otherwise identical scholarship to the student in the next seat, that scholarship would be taxable. We do not believe anyone would seriously urge this result. We do not construe *Ehrhart* and *MacDonald* as precluding us from inquiring further into the nature of the grants before us here, merely because the State of Alaska structured the ARTTC program with the expectation and objective of swelling the pool of native teachers who would go into the villages and teach. Without a more tangible expectation of future employment then the "mere hope" harbored by the school system, we cannot say that the recruitment objective is per se inconsistent with scholarship status for grants made under the ARTTC program. See *Bailey v. Commissioner*, 60 T.C. 447, 455–456 (1973); *Phillips v. Commissioner*, 57 T.C. 420, 426–427 (1971).[14]

The next issue is whether petitioner is liable for additions to tax under section 6653(a) for negligent underpayment of taxes. Since petitioner has not underpaid his taxes, there can be no assessment under section 6653(a).

The final issue in this case is whether petitioner is entitled to attorneys' fees and costs. Petitioner's request is denied because this Court lacks jurisdiction to award attorneys' fees (see *Key Buick Co. v. Commissioner*, 68 T.C. 178 (1977), affd. 613 F.2d 1306 (5th Cir. 1977)), or to award costs (see *Sharon v. Commissioner*, 66 T.C. 515, 533–534 (1976), affd. 591 F.2d 1273 (9th Cir. 1978), cert. denied 442 U.S. 941 (1979)).

*Decision will be entered for the petitioners.*

---

[14]See also *Abrams v. Commissioner*, 33 T.C.M. 722, 43 P-H Memo T.C. par. 74,165 (1974).