LESLIE PETROVICS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Petrovics v. Commissioner
Docket No. 4515-79
United States Tax Court
T.C. Memo 1981-508; 1981 Tax Ct. Memo LEXIS 243; 42 T.C.M. (CCH) 1069; T.C.M. (RIA) 81508; September 14, 1981
Carl Seldin Koerner, for the petitioner. Geraldine R. Eure, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge *244 : Respondent determined a $ 1,020.60 deficiency in petitioner's 1976 tax return. Due to concessions, the issues remaining for decision are (1) whether certain payments received by petitioner while serving as a Fellow in Psychology at New York Hospital qualified as scholarship or fellowship grants excludible from gross income; and (2) whether petitioner is entitled to an education expense deduction for tuition and fees paid to Teachers College, Columbia University. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in New York, New York, when he filed his petition. Petitioner graduated from Union College in 1972. In September 1972 petitioner enrolled in the clinical psychology doctoral program at Teachers College, Columbia University ("Columbia University"). During 1976, while petitioner was still enrolled in this doctoral program, he paid $ 1,834 in fees and tuition to Columbia University. In August 1975 petitioner became a Fellow in Psychology at New York Hospital located in Westchester, New York. [1] New York Hospital is part of Cornell University Medical College. Petitioner's participation in the fellowship program *245 [2] was unrelated to his course of study at Columbia University. He received no academic credit for participating in the fellowship program nor was he required to participate in the program to obtain his doctorate. [3]
*246 New York Hospital is a teaching hospital. All of its permanent staff of psychologists hold Ph.D. degrees in psychology. The average permanent staff member has approximately 10 to 15 years of experience. Most permanent staff members do not have direct patient contact. Rather, they teach and supervise the psychology fellows who, in turn, have personal contact with the patients. The fellowship program consists of three, one-year rotations through various departments or units. The rotations begin July 1 and end on June 30. Petitioner spent the first half of 1976 in a unit which specialized in the treatment of women. As a member of this unit, petitioner performed psychotherapy, [4] administered diagnostic tests, attended seminars and conferences, conducted research and attended hospital staff meetings. [5] Petitioner served as the primary therapist to three or four hospitalized patients and to several outpatients. In this capacity, petitioner had primary responsibility for the patient's care. Petitioner would generally see his hospitalized patients anywhere from three to nine times per week depending upon the patient's needs. Each patient's daily hospital fee included the cost *247 of psychotherapy. Patients seen on an outpatient basis were charged fees based on their ability to pay. *248 Petitioner conducted his psychotherapy sessions on a one-to-one basis with the patient or in a family modality. The hospital required petitioner to prepare written reports following each psychotherapy session. [6] Permanent staff members reviewed these reports with petitioner [7] and the finished product eventually became part of the patient's permanent hospital record. As part of his hospital routine petitioner also administered psychodiagnostic tests. These tests are designed to explore an individual's cognitive functioning and personality functioning. These include the Weschler Memory Scale, the Bender Gestalt test and the Rorschach test. The hospital attempted to increase the educational value of the diagnostic testing by diversifying the types of individuals tested. Following the tests, petitioner prepared written analyses of the results. These written reports were reviewed by permanent staff members and often formed the basis for seminar presentations. it was not unusual for these write-ups to go through several revisions based on consultations *249 with staff members. In the second half of 1976 petitioner changed rotations and became associated with the hospital's children's services unit. Petitioner's activities as a member of this unit entailed treating children on an outpatient basis, supervising several counseling groups conducted at a nearby affiliated hospital, providing consulting services to a nearby day care center for disadvantaged children, conducting psychodiagnostic tests and visiting the homes of children receiving treatment. In addition, petitioner ran a seminar on ego psychology and continued to do research. Petitioner hoped that his research would develop into a doctoral dissertation. During 1976 petitioner worked at the hospital 4 days per week and attended classes at Columbia one day per week. As a psychology fellow, petitioner spent approximately 18 hours per week in direct contact with patients. His total hours at the hospital greatly exceeded this figure because of the time spent in preparing reports, meeting with staff members, attending seminars and performing research. [8] All facets of petitioner's work were closely supervised by permanent staff members. *250 Psychology fellows were paid according to their seniority. In 1976, first-year fellows received $ 8,000 per year and second-year fellows $ 14,500. Petitioner, however, received a reduced amount to reflect his four-day work week. In 1976 petitioner received $ 11,583.20 from Cornell University Medical College. [9] Federal income tax, state income tax and social security tax were withheld from this amount. The hospital also provided petitioner with certain fringe benefits, i.e., vacation leave, health insurance and medical malpractice insurance. In the absence of psychology fellows, the hospital would have to hire additional staff members to obtain the same level of one-to-one contact with its patients. The absence of psychology fellows, however, would more likely result in the hospital's use of different treatment. The staff currently involved in instruction, supervision and administration would be directly involved in patient care. In general, the patients would not get as much individual *251 attention without the psychology fellows. In sum, psychology fellows such as petitioner performed important functions at New York Hospital and played significant roles in the health care services delivered by the hospital. Although it was more expensive to provide patient care in a teaching hospital which maintained a fellowship program, the quality of that care was improved. On his 1976 tax return, petitioner reported the $ 11,583 received from Cornell University Medical College as his only source of gross income. Subsequently, petitioner's 1976 tax return was audited and respondent issued a statutory notice disallowing certain miscellaneous deductions claimed on the return. [10] In his petition, petitioner asserted for the first time that the amount received from Cornell University was excludible from gross income under section 117. [11] On this basis petitioner now claims he is entitled to a refund of $ 633.80. *252 OPINION In 1976 petitioner was a Fellow in Psychology at New York Hospital located in Westchester, New York. New York Hospital is part of Cornell University Medical College. The first issue presented is whether all or any of the $ 11,583.20 received by petitioner in 1976 from Cornell University Medical College is excludible from gross income under section 117. Petitioner contends that the entire $ 11,583.20 is excludible as a fellowship grant. Petitioner further contends that the $ 3,600 limitation in section 117(b)(2) is not applicable because he was a candidate for a Ph.D. degree in psychology during the year in issue. Respondent, on the other hand, asserts that the entire amount represented compensation for services performed which is not excludible. Alternatively, respondent claims that the $ 3,600 limitation is applicable because petitioner's enrollment in the Ph.D. program was unrelated to his participation in the fellowship program. We agree with respondent that the payments received by petitioner represented compensation for services. [12]
Section 117(a)(1) excludes from gross income amounts *253 received as a scholarship at an educational institution or as a fellowship grant. Section 1.117-3(c), Income Tax Regs., defines a fellowship grant as an amount paid to an individual to aid in the pursuit of a study or research. Section 1.117-4(c), Income Tax Regs., specifically provides that payments made as compensation for employment services are not excludible as scholarship or fellowship grants. In upholding the validity of these regulations, the Supreme Court stated that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no strings' educational grants, with no requirement of any substantial quidproquo from the recipients." Bingler v. Johnson, 394 U.S. 741, 751 (1969). The critical test under section 117 is whether the primary purpose for making the payments to petitioner was to educate and train him in his individual capacity or to compensate him for services rendered. See Olick v. Commissioner, 73 T.C. 479, 485 (1979); Brubakken v. Commissioner, 67 T.C. 249, 255 (1976). Determination of the primary purpose of the payments *254 is a factual question on which petitioner bears the burden of proof. Olick v. Commissioner, supra at 486; Rule 142(a), Tax Court Rules of Practice and Procedure.[13]
On the basis of the evidence in the record, we conclude that the primary purpose of the payments made by Cornell University Medical College was to compensate petitioner for the services he rendered as a psychology fellow at New York Hospital. During the year in issue, petitioner rendered significant and valuable services to New York Hospital, the effect of which was to provide a substantial quidproquo for the payments he received. Among his many duties petitioner performed psychotherapy, administered psychodiagnostic tests, provided consulting services to a day care center, supervised counseling groups and conducted a seminar on ego psychology. The breadth of these activities alone is indicative of the substantial services performed by petitioner. That these services were valuable and contributed significantly to the quality of care delivered by the hospital is amply supported by the testimony *255 of Dr. Fred Schwartz, director of the fellowship program. Dr. Schwartz testified that the psychology fellows performed important functions at the hospital and that they played a significant role in the delivery of health care services. The psychology fellows, and not the permanent staff members, provided most of the hospital's direct contact with its patients. [14] According to Dr. Schwartz, the absence of psychology fellows would either necessitate the hiring of additional permanent staff members to continue the same level of patient contact or require a revision of the hospital's mode of treatment whereby patients would get less individual attention. Dr. Schwartz further testified that, in his expert opinion, treatment in a teaching hospital, i.e., one that maintains a fellowship program, improves the quality of care received by a patient. In light of this testimony, we cannot ignore the importance of petitioner's activities to the hospital. Moreover, petitioner's testimony that he served as the primary therapist to several patients and that he had primary responsibility for them, is indicative of the value of his services. *256 In addition to the nature and extent of petitioner's services, there are other factors which support the conclusion reached herein. The amount of the stipend paid to petitioner was not based on a financial need, as is usually true of scholarship or fellowship grants, but was based on his seniority in the program. See Brubakken v. Commissioner, supra at 259. Furthermore, petitioner's payments were reduced to reflect his four-day work week. [15] It is difficult for us to reconcile petitioner's contention that he was being paid to educate and train himself with the fact that the reduction in his payments was the result of his attending classes at Columbia University. Moreover, petitioner received paid vacation leave, health insurance and medical malpractice insurance. These fringe benefits are usually characteristic of an employment relationship. Id. at 259. In support of his position, petitioner relies upon the case of Wells v. Commissioner, 40 T.C. 40 (1963). The Wells case involved an individual who was a candidate for a Ph.D. in clinical *257 psychology at New York University. As a required part of the program leading to that degree, the taxpayer worked part-time in a psychological training program at a Veterans Administration hospital. The program was planned and supervised jointly by the hospital and New York University. The taxpayer's services to the hospital were limited and were primarily to obtain practical experience. Based on the record in Wells, we held that the payments received by the taxpayer were excludible from gross income. Each case, however, must turn on its own facts and, unlike Wells, the record in this case clearly indicates the importance and significance of the services rendered by petitioner to the hospital. Petitioner also points to a number of factors to support his position. These include the substantial supervision received by petitioner, the academic emphasis of the fellowship program, petitioner's flexible work schedule, the nominal fees charged by the hospital for petitioner's services, and the added expense to the hospital of maintaining the program. Amalgamating all these factors, petitioner reaches the conclusion that "[a]ny benefit derived from the fellowship program *258 was incidental to the primary function of the program to educate and train predoctoral candidates." We do not agree. In the first place, the fact that petitioner's activities were closely supervised is not necessarily inconsistent with a finding that his services were valuable to the hospital. See Brubakken v. Comissioner, supra at 257. This is especially true in this case where petitioner had primary responsibility for several patients and his psychotherapy services were generally conducted on a one-to-one basis without the presence of supervisors. Second, the academic and educational tone of the fellowship program reflected in its use of seminars, its method of assigning patients and its allotment of research time (one day per week), is not inconsistent with our holding. We need only find that the primary purpose of the payments in issue, and not the sole purpose, was to compensate for petitioner's services. Therefore, the fact that petitioner participated in a well-rounded fellow-ship program is not determinative. See Proskey v. Commissioner, 51 T.C. 918, 924-925 (1969). Third, the flexibility of petitioner's hospital schedule existed *259 only so long as he completed his assignments or provided for their coverage. In our view, this only reaffirms the importance of petitioner's services; otherwise it would not matter whether or not petitioner's assignments went uncovered. Furthermore, even though petitioner's schedule was flexible, it was not unusual for him to spend 60 hours per week at the hospital. Petitioner's substantial presence at the hospital further indicates the substantiality of his services. Fourth, the nominal fees charged by the hospital to petitioner's patients are not reflective of the value of those services. Rather, the fees reflect the hospital's determination of the outpatient's ability to pay and not the worth of the services received. [16]
Finally, petitioner places undue emphasis on the financial burden of the fellowship program on the hospital. Although Dr. Schwartz did testify that it is more expensive to provide patient care in a hospital which maintains a fellowship program, he also testified that the care received is improved as a result of the program. What is significant for our purposes *260 is that the presence of psychology fellows such as petitioner made it possible for the hospital to provide more effective, albeit more expensive, care to its patients. It is this contribution to the hospital's delivery of health care services that persuades us that the payments received by petitioner were intended as compensation. In sum, we find that the $ 11,583.20 received by petitioner from Cornell University Medical College in 1976 did not constitute a fellowship or scholarship excludible from gross income under section 117. Consequently, we need not decide if the $ 3,600 limitation under section 117(b)(2) is applicable. The second issue is whether petitioner is entitled to deduct $ 1,834 in tuition and fees paid to Columbia University in 1976. Petitioner contends that, prior to and during the year in issue, he was engaged as a psychotherapist and that the courses taken at Columbia University were intended to improve or maintain his skills as a psychotherapist. Accordingly, petitioner concludes that he is entitled to an education expense deduction under section 162. On the other hand, respondent asserts that petitioner's expenditures are not deductible because his course *261 of study qualified him for a new trade or business. Section 162 allows a deduction for ordinary and necessary business expenses. Section 1.162-5, Income Tax Regs., sets forth guidelines for determining those educational expenses which are and which are not ordinary and necessary expenses incident to a taxpayer's trade or business. In this regard, section 1.162-5(b)(3)(i), Income Tax Regs., provides: (b) Nondeductible educational expenditures * * * (3) Qualification for new trade or business. (i) The second category of nondeductible educational expenses within the scope of subparagraph (1) of this paragraph are expenditures made by an individual for education which is part of a program of study being pursued by him which will lead to qualifying him in a new trade or business. * * * Thus, otherwise deductible educational expenses are non-deductible if they will lead to qualifying the taxpayer for a new trade or business. The taxpayer bears the burden of demonstrating that his education expenditures will not lead to qualifying him for a new trade or business. Rule 142(a). Even assuming petitioner was in the trade or business of being a psychotherapist and that *262 the courses at Columbia University maintained or improved his skills in that capacity, we conclude that petitioner is not entitled to an education expense deduction. The determination of whether education expenditures qualify a taxpayer for a new trade or business depends on a comparison of pre-education and post-education activities. If the education qualifies the taxpayer to perform significantly different tasks and activities than he or she could perform prior to the education, than the education qualifies him for a new trade or business. Davis v. Commissioner, 65 T.C. 1014, 1019 (1976); Glenn v. Commissioner, 62 T.C. 270, 275 (1974). Unfortunately, the record in this case does not sufficiently disclose the differences between a psychotherapist and a licensed psychologist to permit us to evaluate whether or not petitioner's course of study leading to a Ph.D. in clincial psychology qualifies him for a new trade or business. [17] Petitioner must bear the consequences of this evidentiary void. Rule 142(a). *263 Moreover, the evidence that does exist implies that petitioner's education expenses did qualify him for a new trade or business. By pursuing his degree petitioner would eventually receive his doctorate and qualify as a licensed psychologist. Testimony at trial indicated that licensed psychologists enjoy more stature and better employment opportunities than psychotherapists who generally have less formal training and experience. [18] Presumably, the additional education and the opportunities it affords reflect a distinction in the tasks and activities psychologists are capable of performing. Furthermore, petitioner's own description of his activities as a psychology fellow suggests to us that the scope of a psychologist's activities exceed those of a psychotherapist. In this regard, we note that petitioner listed psychotherapy as only one of the activities he performed at the hospital. We attribute the breadth of petitioner's activities to the fact that the hospital viewed him as a future licensed psychologist and not as a psychotherapist. [19]
*264 To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Psychology fellows consist solely of individuals who intend to obtain Ph.D.'s in psychology. The selection of fellows at New York Hospital is made by a committee based on an applicant's resume, recommendations and personal interviews with committee members. The merit selection is unaffected by an applicant's financial status. Petitioner applied for the position after being notified of an opening by the program's director, Dr. Fred Schwartz. Petitioner had previously worked with Dr. Schwartz at Montefiore Hospital prior to the latter's departure to join the staff at New York Hospital. Petitioner participated in some type of internship program at Montefiore Hospital prior to his selection for the fellowship program at New York Hospital. ↩
2. Any reference to the "fellowship program" is not intended to express an opinion as to whether any part of the payments received by the program's participants constitutes excludible fellowship payments under section 117 of the Internal Revenue Code↩. 3. The record is unclear regarding the fellowship program's purpose. Presumably, New York Hospital conferred some type of certificate upon the program's participants on their completion of the program. Participants were under no obligation to the hospital or to Cornell University Medical College upon completion of the program.↩
4. The record indicates that there are differences between psychologists and psychotherapists. Psychologists are licensed in the State of New York. New York Educ. Law § 7601 (McKinney 1972). The education and training of a psychologist is more formal and extensive than that of a psychotherapist. For example, a licensed psychologist must hold a doctoral degree in psychology (New York Educ. Law § 7603 (McKinney 1972)) whereas psychotherapists require less formal education and training. As a result, psychologists generally enjoy greater stature and prestige. Furthermore, psychologists are more likely to secure positions in hospitals and educational institutions. New York Hospital does not hire psychotherapists per se; rather psychology fellows and staff psychologists perform psychotherapy as part of their hospital duties. ↩
5. The seminars were generally conducted by permanent staff members and were of a recurring nature. The fellowship program also encouraged participants to engage in library research and alloted time for this endeavor. Petitioner spent approximately one day per week doing research.↩
6. These reports generally took petitioner one-half hour to prepare. ↩
7. These review sessions generally lasted one hour.↩
8. In general, petitioner's hours at the hospital were somewhat flexible so long as his work was covered. It was not unusual, however, for petitioner to spend 60 hours per week at the hospital.↩
9. Psychology fellows, staff psychologists and staff psychiatrists are paid by Cornell University Medical College. The remainder of the hospital staff is paid by New York Hospital.↩
10. Included among these deductions was the education expense deduction claimed by petitioner for fees and tuition paid to Columbia University. ↩
11. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
12. Consequently, we do not reach respondent's alternative argument.↩
13. All "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
14. On the average, a psychology fellow spends approximately 18 hours per week in direct contact with patients.↩
15. Petitioner attended classes at Columbia University one day per week.↩
16. Separate fees for petitioner's services were not charged to hospitalized patients.↩
17. We have been unable to locate, and the parties have not cited to us, any statutory expression of the tasks or activities which psychologists or psychotherapists may undertake.↩
18. We have been unable to find any licensing provision specifically applicable to psychotherapists nor have the parties brought any such statute to our attention. ↩
19. This is in accord with the hospital's policy of hiring only Ph.D. candidates for its fellowship program.↩